C. D. Michel - S.B.N. 144258
Sean A. Brady - S.B.N. 262007
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: 562-216-4444
Facsimile: 562-216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN  DISTRICT OF CALIFORNIA

## FRESNO BRANCH COURTHOUSE

| | |
|---|---|
| BARRY BAUER, STEPHEN WARKENTIN, NICOLE FERRY, LELAND ADLEY, JEFFREY HACKER, NATIONAL  RIFLE ASSOCIATION OF AMERICA, INC.,  CALIFORNIA RIFLE PISTOL ASSOCIATION FOUNDATION, HERB BAUER SPORTING GOODS, INC. <br><br> Plaintiffs <br><br> vs. <br><br> KAMALA HARRIS, in Her Official Capacity as Attorney General For the State of California; STEPHEN LINDLEY, in His Official Capacity as Acting Chief for the California Department of Justice, and DOES 1-10. <br><br> Defendants. | CASE NO. 1:11-cv-01440-LJO-MJS <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **42 U.S.C. sections 1983, 1988** |

PLAINTIFFS, by and through their undersigned attorneys, bring this Complaint for Declaratory and Injunctive Relief against the above-named Defendants, their employees, agents, and successors in office (collectively "DEFENDANTS"), and in support thereof allege the following:

**INTRODUCTION**

1. This case involves an important constitutional principle, that a state may not impose a fee on the People as a precondition to their enjoyment of a fundamental right secured by the federal constitution if the fee either exceeds the state's costs of regulating the fee payer's exercise of that right *or* the fee is used to finance state activities not reasonably related to such regulations.

2. Vindication of this principle requires enjoinment of DEFENDANTS' current implementation of its fee system for lawful firearm transactions, since it imposes fees that are both excessive and are improperly used to fund general law enforcement activities bearing no reasonable nexus to firearm purchasers nor valid regulations of their constitutionally protected activity.

3. California statutes confer on DEFENDANTS[1] the authority to impose multiple, separate fees on the purchasers[2] of firearms. Payment of these fees is mandatory before one can receive a firearm. DEFENDANTS have discretion as to whether to charge these fees and in what amount to charge them, up to a statutorily imposed cap.

4. DEFENDANTS' imposition of these fees, and in some cases the very statutes conferring the authority on DEFENDANTS to spend the revenues from the fees on extraneous matters, violates PLAINTIFFS' Second Amendment rights.

5. When a person wishes to obtain a firearm in California, state law generally requires the person to obtain the firearm through a federally licensed California firearm vendor (commonly known as an "FFL").

---

[1] DEFENDANTS are being sued in their official capacity as heads of the California Department of Justice, which entity is authorized by the Legislature to assess the Challenged Fees.

[2] These fees apply even if a firearm is not being purchased but gifted or traded as well. But for simplicity sake "purchase" will be used throughout this Complaint to include all such activities unless specifically stated otherwise.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

6.  In doing so, the would-be purchaser must, among other things, fill out a Dealer's Record of Sale form ("DROS"), the information from which is used by DEFENDANTS to conduct a background check and confirm the would-be purchaser may lawfully receive firearms before he or she can take possession of any firearm.  In the case of a handgun, the information is also used to register the handgun to the purchaser in DEFENDANTS' Automated Firearm System ("AFS").

7.  DEFENDANTS have statutory discretion to charge firearm purchasers a mandatory fee for processing each DROS, along with two additional fees, for every firearm transaction. And, in the case of a handgun, California requires purchasers to have a valid Handgun Safety Certificate, for which DEFENDANTS may impose yet another fee.

8.  DEFENDANTS collect these fees through the FFL at the time of purchase and currently exercise their discretion by uniformly charging the statutorily allowed maximum amount for each of the Challenged Fees.

9.  PLAINTIFFS bring this suit to challenge the constitutionality of DEFENDANTS' imposition of these fees levied on the transfer of firearms; specifically, those fees provided for by California Penal Code sections 28225(a)-(c) [12076(e)], 28300(c) [12076.5(b)], 23690(a) [12088.9(a)], and 31650(c) [12805(e)] (collectively, the "Challenged Fees").[3]

10.  Each of the Challenged Fees as currently imposed by DEFENDANTS infringes on PLAINTIFFS' Second Amendment rights, both because DEFENDANTS charge the fees in excessive amounts and because they improperly

---

[3]  Pursuant to the Legislature's enactment of Assembly Concurrent Resolution 73 (McCarthy) 2006, which authorized a Non-Substantive Reorganization of California's Deadly Weapons Statutes, various California Penal Code sections were renumbered, effective January 1, 2012. For convenience and ease of reference, the corresponding previous code section for each referenced Penal Code section is provided in brackets.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    utilize the fees' windfall revenues to finance general law enforcement activities

2    unrelated to the regulation of lawful firearm purchases.

3         11.  It is not just PLAINTIFFS' contention alone that the Challenged Fees are

4    excessive as currently imposed. DEFENDANTS themselves have admitted as

5    recently as 2010 that at least one of the Challenged Fees is too high. And, the

6    accounts containing the revenues amassed from the Challenged Fees, which

7    DEFENDANTS manage, regularly run *multi-million dollar* annual surpluses when

8    constitutional principles limit such government assessments to the reasonable cost

9    of regulating the activity on which the fee is imposed.

10        12.  Nor is it just PLAINTIFFS' contention alone that revenues from the

11   Challenged Fees are used for purposes beyond regulating lawful firearm

12   purchasers. DEFENDANTS' history of supporting legislation to expand the list of

13   activities for which DEFENDANTS may use revenues from the Challenged Fees,

14   demonstrates DEFENDANTS' past and continuing use of the Challenged Fees'

15   revenues unconstitutionally.

16        13.  Most notable is a recent amendment to the California Penal Code adding

17   mere *possession* of firearms to that list,[4] thereby forcing *lawful* firearm purchasers

18   to finance *any* law enforcement operation concerning *unlawful* firearm possession.

19   This is tantamount to the government charging a fee to all speakers and the funds

20   being used to subsidize law enforcement programs targeting a small subset of

21   speakers who scream "fire" in a crowded theater.

22        14.  Despite the significant surpluses from their revenues and the use of those

23   revenues on activities unrelated to regulating lawful firearm transfers, DOJ *chooses*

24   to charge the maximum amounts statutorily allowed for the Challenged Fees.

25        15.  Concomitant to their as applied challenge to DEFENDANTS' imposition

26   of the Challenged Fees, PLAINTIFFS facially challenge certain California Penal

27   _____

28        [4] See description of Senate Bill 819, discussed below at Paragraph 103.

4

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Code sections that expressly allow the unlawful expenditure of the Challenged Fees' revenues; specifically, California Penal Code sections 28235, 28225, 31650, and 28300.

16.  Because the Challenged Fees and their related statutes affect constitutionally protected activity, irreparable harm is presumed. Accordingly, the following relief from this Court is warranted:

(a) a declaration that the Challenged Fees as currently imposed by DEFENDANTS are unconstitutionally excessive, and an injunction prohibiting DEFENDANTS from collecting the Challenged Fees until they reduce them to non-excessive amounts;

(b) a declaration that DEFENDANTS' use of revenues from the Challenged Fees on special weapon permitting and general law enforcement activities not reasonably related to the regulation of lawful firearm transactions is unconstitutional, and an injunction prohibiting DEFENDANTS from using those revenues on such activities; and

(c) a declaration that the California Penal Code statutes with provisions authorizing DEFENDANTS' improper expenditures of the Challenged Fees' revenues on activities not reasonably related to the regulation of lawful firearm transactions are facially unconstitutional, and an injunction prohibiting DEFENDANTS from acting pursuant to those statutes.

**JURISDICTION and VENUE**

17.  Jurisdiction of this action is founded on 28 U.S.C. §§ 1331 and 1343, in that this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983, in that this action seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs, and usages of the State of California and political subdivisions thereof, of rights, privileges, or immunities secured by the United States Constitution and by

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   Acts of Cong ress.

2        18.  PLAINTIFFS' claims for declaratory and injunctive relief are authorized

3   by 28 U.S.C. §§ 2201 and 2202.

4        19.  Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2)

5   because a substantial part of the events or omissions giving rise to the claims

6   occurred in this district.

7                                **PARTIES**

8   **I.    Plaintiffs**

9        20.  Plaintiff BARRY BAUER is a resident, property owner, and taxpayer of

10  Fresno, California. Within the last five years, Plaintiff BAUER has lawfully

11  purchased firearms, including both handguns and long-guns, for which he has had

12  to pay each of the Challenged Fees. Plaintiff BAUER intends to continue to

13  purchase firearms through an FFL in the future.

14       21.  Plaintiffs STEPHEN WARKENTIN and JEFFREY HACKER are

15  residents, property owners, and taxpayers of Fresno, California. Within the last five

16  years, each has purchased multiple firearms from both an FFL and a private party,

17  through an FFL as required by California Penal Code § 26500 [12070]. These

18  transactions have consisted of both handguns and long-guns. Some of these

19  transactions involved a single firearm, while others involved multiple handguns

20  (by way of private party transfers), multiple long-guns, and a combination of a

21  handgun and a long-gun. Plaintiffs WARKENTIN and HACKER intend to

22  continue their pattern of regularly purchasing firearms through an FFL in the

23  future.

24       22.  For each of their transactions, Plaintiffs WARKENTIN and HACKER

25  have paid all fees California requires for firearm transfers described below.

26  Accordingly, each of them has paid $50 in state fees for a transaction including a

27  single handgun and a single long-gun, $46 for a transaction including two

28  handguns, and $25 for transactions involving a single firearm or multiple long-

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

guns.[5]  Plaintiffs WARKENTIN and HACKER have had to pay the Challenged Fees multiple times in the same year, and, in some cases, the same month. Also, Plaintiffs WARKENTIN and HACKER have each had to pay California's $15 fee to obtain a Handgun Safety Certificate once within the last five years.

23.  Plaintiff NICOLE FERRY is a resident of Fresno, California. Within the last five years, Plaintiff FERRY has purchased handguns from an FFL for self-defense and target practice. For each of her transactions, Plaintiff FERRY has paid all "fees" California requires for firearm transfers described below. Plaintiff FERRY has had to pay California's fees for firearm transfers more than once in the same year. Also, Plaintiff FERRY has had to pay California's $15 fee to obtain a Handgun Safety Certificate once within the last five years. Plaintiff FERRY intends to purchase firearms through an FFL in the future.

24.  Plaintiff LELAND ADLEY is a resident, property owner, and taxpayer of Fresno, California. Within the last five years, Plaintiff ADLEY has purchased multiple firearms from both an FFL and a private party, through an FFL as required by California Penal Code § 26500 [12070], including both handguns and long-guns.

25.  For each of his transactions, Plaintiff ADLEY paid all fees California requires for firearm transfers described below. Plaintiff ADLEY has had to pay California's fees for firearm transfers multiple times in the same year. Also, Plaintiff ADLEY has had to pay California's $15 fee to obtain a Handgun Safety Certificate once within the last five years. Plaintiff ADLEY intends to continue his pattern of regularly purchasing firearms through an FFL in the future.

26.  Plaintiff NATIONAL RIFLE ASSOCIATION OF AMERICA, INC. (hereafter "NRA") is a non-profit entity classified under section 501(c)(3) of the

---

[5] See OVERVIEW OF REGULATORY SCHEME, Section II. - "California Fees Imposed on Firearm Sales and Transfers" for an explanation and breakdown of each of these fee amounts.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Internal Revenue Code and incorporated under the laws of New York, with its principal place of business in Fairfax, Virginia. NRA has a membership of approximately 4 million persons. The purposes of NRA include protection of the right of law-abiding citizens to keep and bear firearms for the lawful defense of their families, persons, and property, and from unlawful government regulations and preconditions placed on the exercise of that right. NRA spends its resources on each of those activities. NRA brings this action on behalf of itself and its hundreds of thousands of members in California, including Plaintiffs BAUER, WARKENTIN, ADLEY, and HACKER, who have been, are being, and will in the future be subjected to DEFENDANTS' imposition of the Challenged Fees.

27. Plaintiff CALIFORNIA RIFLE AND PISTOL ASSOCIATION FOUNDATION ("CRPA FOUNDATION") is a non-profit entity classified under section 501(c)(3) of the Internal Revenue Code and incorporated under California law, with headquarters in Fullerton, California. Contributions to the CRPA FOUNDATION are used for the direct benefit of Californians. Funds contributed to and granted by CRPA FOUNDATION benefit a wide variety of constituencies throughout California, including gun collectors, hunters, target shooters, law enforcement, and those who choose to own a firearm to defend themselves and their families. The CRPA FOUNDATION spends its resources seeking to raise awareness about unconstitutional laws, defend and expand the legal recognition of the rights protected by the Second Amendment, promote firearms and hunting safety, protect hunting rights, enhance marksmanship skills of those participating in shooting sports, and educate the general public about firearms. The CRPA FOUNDATION supports law enforcement and various charitable, educational, scientific, and other firearms-related public interest activities that support and defend the Second Amendment rights of all law-abiding Americans.

28. In this suit, the CRPA FOUNDATION represents the interests of its many citizen and taxpayer members and members of its related association the California

Rifle and Pistol Association who reside in California and who wish to sell or purchase firearms, or who have sold or purchased firearms, and have been charged fees imposed by the laws of the State of California associated with those transactions. These members are too numerous to conveniently bring this action individually. The CRPA FOUNDATION brings this action on behalf of itself and its tens of thousands of supporters in California, including Plaintiff BAUER, who have been, are being, and will in the future be subjected to DEFENDANTS' imposition of the Challenged Fees.

29.   Plaintiff HERB BAUER SPORTING GOODS, INC., is a California corporation with its principal place of business in the County of Fresno, California. It is a licensed firearms dealer under both federal and California law (i.e., an FFL) that sells a variety of firearms, including both long-guns and handguns. California law requires Plaintiff HERB BAUER to collect the Challenged Fees for DOJ, at DOJ's direction, from firearm transferees. Accordingly, Plaintiff HERB BAUER is injured by its being forced to facilitate DEFENDANTS' unlawful fee collection activities.

30.   The individual PLAINTIFFS identified above are residents and taxpayers of California from the City and County of Fresno who have been required to pay the Challenged Fees in violation of their rights and applicable law.

31.   Each of the associational PLAINTIFFS identified above has individual members who are citizens and taxpayers of California, including in Fresno County, who have an acute interest in purchasing firearms and do not wish to pay unlawful fees, taxes, or other costs associated with that purchase and thus have standing to seek declaratory and injunctive relief to halt or reduce the imposition or charging of unconstitutional fees. The interests of these members are germane to their respective associations' purposes; and neither the claims asserted nor the relief requested herein requires their members participate in this lawsuit individually. / / /

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## II.   Defendants

32.   Defendant KAMALA HARRIS is the Attorney General of California. She is the chief law enforcement officer of California, and is charged by Article V, Section 13 of the California Constitution with the duty to inform the general public and to supervise and instruct local prosecutors and law enforcement agencies regarding the meaning of the laws of the State, including the Challenged Fees, and to ensure the fair, uniform and consistent enforcement of those laws throughout the state. She is sued in her official capacity.

33.   Defendant STEPHEN LINDLEY is the Acting Chief of the DOJ Bureau of Firearms and, as such, is responsible for executing, interpreting, and enforcing the laws of the State of California – as well as its customs, practices, and policies – at issue in this lawsuit. He is sued in his official capacity.

34.   Defendants HARRIS and LINDLEY (collectively "DEFENDANTS") are responsible for administering and enforcing the Challenged Fees, are in fact presently enforcing the challenge provision against PLAINTIFFS, and will continue to enforce the Challenged Fees against PLAINTIFFS.

35.   The true names or capacities, whether individual, corporate, associate or otherwise of the DEFENDANTS named herein as DOES 1-10, are presently unknown to PLAINTIFFS, who therefore sue said DEFENDANTS by such fictitious names. PLAINTIFFS pray for leave to amend this Complaint and Petition to show the true names, capacities, and/or liabilities of DOE Defendants if and when they have been determined.

## OVERVIEW OF REGULATORY SCHEME

## I.   Constitutional Provisions and Controlling Law

36.   The Second Amendment to the United States Constitution provides: "A well regulated militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II.

37.   The United States Supreme Court held in *District of Columbia v. Heller*,

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   554 U.S. 570 (2008), that the Second Amendment of the United States Constitution

2   protects an individual civil right to possess firearms for self-defense.

3       38.  The Court soon thereafter held in *McDonald v. Chicago*, 561 U.S. 3025

4   (2010), that the Second Amendment is incorporated through the Due Process

5   clause of the 14th Amendment to restrict state and local governments from

6   infringing on the individual right to keep and bears arms, and confirmed the right is

7   a fundamental one.

8       39.  The right to keep and bear arms for self-defense implies a corresponding

9   right to acquire firearms. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir.

10  2011); *see also Andrews v. State*, 50 Tenn. 165, 178, 8 A. Rep. 8, 13 (1871) (cited

11  approvingly in *Heller* at 614).

12      40.  In *Cox v. New Hampshire*, 312 U.S. 569 (1941), the United States

13  Supreme Court indicated that government's authority to levy fees on the exercise

14  of constitutional rights is limited. The Court held that fees charged for licenses to

15  parade on public property, being protected speech activity, can only be of amounts

16  necessary to "meet the expense incident to the administration of the Act and to the

17  maintenance of public order *in the matter licensed*." Id. at 577 (emphasis added).

18  Any additional charge above and beyond that rate would be invalid.

19      41.  In *Murdock v. Pennsylvania*, 319 U.S. 105 (1943), the United States

20  Supreme Court expounded on the principle it enunciated in *Cox*, holding "[a] state

21  may not impose a charge for the enjoyment of a right granted by the federal

22  constitution" because "a person cannot be compelled to purchase, through a license

23  fee or a license tax, the privilege freely granted by the constitution." *Id.* at 112. The

24  *Murdock* Court qualified that general rule by indicating that States may impose a

25  fee when constitutionally protected activity is involved, but only if the fee is

26  imposed "as a regulatory measure and calculated to defray the expenses of policing

27  the activities in question." It is not permissible, however, to impose "a flat license

28  tax levied and collected as a condition" to the "enjoyment of a right granted by the

1  Federal Constitution" and "unrelated to the scope of the activities of [the fee
2  payer]." Id. at 114.

3  **II.   California Fees Imposed on Firearm Sales and Transfers**

4      42.  California confers discretion on DOJ to impose various fees – all of which
5  have a statutory cap – on firearm purchasers, which they must pay as a prerequisite
6  to qualify for receiving a firearm.

7      **A.   The Dealer's Record of Sale (DROS) Fee [6]**

8      43.  California Penal Code sections 28225(a)-(c) [formerly 12076(e)], 28230
9  [12076(f)], 28235 [12076(g)], and 28240(a)-(b) [12076(i)], establish the fees
10 associated with a DROS, and govern what the funds collected therefrom can be
11 used for.

12     44.  Subdivision (a) of Penal Code section 28225 [12076(e)] provides:

13     The [DOJ] may require the [FFL] to charge each firearm purchaser a
   fee not to exceed fourteen dollars ($14), except that the fee may be
14 increased at a rate not to exceed any increase in the California
   Consumer Price Index as compiled and reported by the  Department of
15 Industrial Relations.

16     45.  The use of the "may" in subdivision (a) of Penal Code section 28225
17 [12076(e)] makes clear that DEFENDANTS are not *required* to charge the
18 maximum fee amount allowed for by that statute, or to even charge *any* fee at all.

19     46.  Penal Code section 28240(a) [12076(i)(1)] mandates that DOJ charge only
20 one DROS fee for a single transaction on the same date for any number of firearms
21 that are not handguns. This means regardless of the number of long-guns (*i.e.*, rifles
22 and shotguns) an individual purchases at one time, the DOJ charges one DROS fee
23 for all of them.

24     47.  Penal Code section 28240(b) [12076(i)(2)], provides that, in a single

25

26     [6] The fees DOJ charges pursuant to California Code of Regulations, Title
27 11, Section 4001, and Penal Code sections 28225(a)-(c) [12076(e)],
   12076(f)(1)(B) [28230(a)(2)], discussed herein, shall be referred to as the "DROS
28 fee" throughout.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   transaction on the same date for the delivery of any number of handguns, the DOJ

2   must charge a reduced DROS fee for any additional handguns that are part of that

3   same transaction. This means when an individual purchases more than one handgun

4   at the same time, the DOJ charges the DROS fee in full for the first handgun and a

5   reduced DROS fee for each additional handgun.

6      48.   Where an individual purchases a handgun and any number of long-guns at

7   the same time, DOJ charges the purchaser a full DROS fee *for each* transaction.

8   This means where a long-gun is purchased along with a handgun the purchaser

9   must pay *two full* DROS fees, one for the handgun and one for the long-gun –

10  despite *no* separate DROS fee being required for additional long-gun purchases and

11  only a reduced DROS fee being required for each additional handgun.

12     49.   The DOJ promulgated California Code of Regulations, Title 11, section

13  4001, increasing the cap on the DROS fee from $14 to $19 for the first handgun or

14  any amount of rifles/shotguns in a single transaction, and capping the DROS fee

15  for each additional *handgun* being purchased along with the first handgun at $15.

16     50.   Subdivision (b) of Penal Code section 28225 [12076(e)] further provides

17  that "[t]he [DROS] fee shall be no more than is necessary to fund" the activities

18  enumerated at Penal Code section 28225(b)(1)-(11) [12076(e)(1)-(10)].

19     51.   Penal Code section 28225(b)(11) [12076(e)(10)] purports to authorize the

20  DOJ to use revenues from the DROS fee to fund "the estimated reasonable costs of

21  [DOJ] firearms-related regulatory and enforcement activities related to the sale,

22  purchase, possession, loan, or transfer of firearms."

23     52.   Prior to January 1, 2012, section 28225(b)(11) [12076(e)(10)] did not

24  provide for expenditure of DROS fee revenues on the mere "possession" of

25  firearms. But the Legislature amended that section during the 2011 Legislative

26  session to allow for such, based on its following purported findings:

27     SECTION 1. The Legislature finds and declares all of the following:

28         (a) California is the first and only state in the nation to establish an

13

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

automated system for tracking handgun and assault weapon owners who might fall into a prohibited status.

(b) The California Department of Justice (DOJ) is required to maintain an online database, which is currently known as the Armed Prohibited Persons System, otherwise known as APPS, which cross-references all handgun and assault weapon owners across the state against criminal history records to determine persons who have been, or will become, prohibited from possessing a firearm subsequent to the legal acquisition or registration of a firearm or assault weapon.

(c) The DOJ is further required to provide authorized law enforcement agencies with inquiry capabilities and investigative assistance to determine the prohibition status of a person of interest.

(d) Each day, the list of armed prohibited persons in California grows by about 15 to 20 people. There are currently more than 18,000 armed prohibited persons in California. Collectively, these individuals are believed to be in possession of over 34,000 handguns and 1,590 assault weapons. The illegal possession of these firearms presents a substantial danger to public safety.

(e) Neither the DOJ nor local law enforcement has sufficient resources to confiscate the enormous backlog of weapons, nor can they keep up with the daily influx of newly prohibited persons.

(f) A Dealer Record of Sale fee is imposed upon every sale or transfer of a firearm by a dealer in California. Existing law authorizes the DOJ to utilize these funds for firearms-related regulatory and enforcement activities related to the sale, purchase, loan, or transfer of firearms pursuant to any provision listed in Section 16580 of the Penal Code, but not expressly for the enforcement activities related to possession.

(g) Rather than placing an additional burden on the taxpayers of California to fund enhanced enforcement of the existing armed prohibited persons program, it is the intent of the Legislature in enacting this measure to allow the DOJ to utilize the Dealer Record of Sale Account for the additional, limited purpose of funding enforcement of the Armed Prohibited Persons System.

53. Penal Code section 28230(a)(2) [12076(f)(1)(B)] provides for DOJ to also use DROS fee revenues for "the actual processing costs associated with the submission of a [DROS] to the [DOJ]."

54. Section 28235 [12076(g)] provides:

All money received by the department pursuant to this article shall be deposited in the Dealers' Record of Sale Special Account of the General Fund, which is hereby created, to be available, upon appropriation by the Legislature, for expenditure by the department to offset the costs incurred pursuant to any of the following:

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(a) This article.
(b) Section 18910.
(c) Section 27555.
(d) Subdivisions (d) and (e) of Section 27560.
(e) Article 6 (commencing with Section 28450).
(f) Section 31110.
(g) Section 31115.
(h) Subdivision (a) of Section 32020.
(i) Section 32670.
(j) Section 33320.

55.  The reference to "this article" in section 28235 means Article 3 of Chapter 6 of Title 4 of Part 6 of the California Penal Code (beginning at section 28200 and ending with section 28250), which includes the section providing for imposition of the DROS fee.

56. The activities covered in the Penal Code sections referenced by section 28235 [12076(g)] include: **(1)** inspections of "Destructive Device" Permit-Holders (Cal. Penal Code § 18910 [12305(f)-(g)]); **(2)** the California FFL Check Program (Cal. Penal Code § 27555 [12072(f)(1)]); **(3)** a public education program pertaining to importers of personal handguns (Cal. Penal Code § [27560(d)-(e)]) [12072(f)(2)(D)]; **(4)** the Centralized List of Exempted FFLs (Cal. Penal Code § 28450, *et seq.* [12083]); **(5)** inspections of "Assault Weapon" Permit-Holders (Cal. Penal Code § 31110 [12289.5]); **(6)** public education program regarding registration of "assault weapons" (Cal. Penal Code § 31115 [12289]); **(7)** retesting of handguns certified as "not unsafe" (Cal. Penal Code § 32020(a) [12131(c)]); **(8)** inspections of Machine Gun Permit-Holders (Cal. Penal Code § 32670 [12234]); and **(9)** inspections of Short-Barreled Long Gun Permit-Holders (Cal. Penal Code § 33320 [12099]).

57.  Pursuant to statute, revenue from the DROS fee is supposed to be deposited into the DROS Special Account of the General Fund ("DROS Special

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Account"). Cal. Penal Code § 28235 [12076(g)].[7]

**B.    Firearms Safety and Enforcement Special Fund Fees**

58.  California Penal Code section 28300(a)-(b) [12076.5(a)] provides:

(a) The Firearms Safety and Enforcement Special Fund is hereby established in the State Treasury and shall be administered by the [DOJ].

(b) Notwithstanding Section 13340 of the Government Code, all moneys in the fund are continuously appropriated to the [DOJ], without regard to fiscal years, for the purpose of implementing and enforcing the provisions of Article 2 (commencing with Section 31610) of Chapter 4 of Division 10, enforcing Section 830.95, Title 2 (commencing with Section 12001) of Part 4, Sections 16000 to 16960 [12070(c)(2)], inclusive, Sections 16970 [12277] to 17230 [12650], inclusive, Sections 17240 [12401] to 21390 [12028(a)], inclusive, and Sections 21590 [12028(a)] to 34370 [12078(a)(5)], inclusive, and for the establishment, maintenance, and upgrading of equipment and services necessary for firearms dealers to comply with Article 2 (commencing with Section 28150 [12077(g)]).

59.  The "provisions of Article 2" mentioned in Section 28300(b) concern the Handgun Safety Certificate Program (discussed below) provided for in sections 31610 [12800], *et seq.*

60.  California Penal Code section 830.95 mentioned in Section 28300(b) prohibits picketing while wearing the uniform of a peace officer.

61.  Title 2 (commencing with Section 12001) of Part 4 concerns sentence enhancements for convictions of firearm related crimes.

62. The provisions ranging between Section 16000 and 34370 [12078(a)(5)] mentioned in section 28300(b) as activities funded by the Firearms Safety and Enforcement Special Fund, include all manner of laws regulating "deadly weapons," including not only handguns and long-guns, but also "unsafe

---

[7]  DEFENDANTS deposit (and commingle) funds collected from some additional fees – for special firearm licensing and miscellaneous services (*see e.g,*, Cal. Penal Code §§ 30900-30905 [12285(a),(b)]), concealed weapon permit applications and Cal. Pen. Code § 26190(a)-(b) [12054]), "Assault Weapon" Permits – into the DROS Special Account. The validity of those fees is not at issue, here; rather, what is at issue is whether DEFENDANTS spend revenues from the Challenged Fees on regulating the activities those other fees are collected for. PLAINTIFFS contend that DEFENDANTS are improperly doing so.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

handguns," machine guns, "assault weapons," destructive devices, ammunition, boobytraps, body armor, tear gas, silencers, switchblade knives, and "less lethal devices."

63.   The Firearms Safety and Enforcement Special Fund is funded by revenues generated from two separate fees charged to firearm purchasers.

**1.   The $5 Fee**

64.   California Penal Code Section 28300(c) [12076.5(b)] provides:

> (c) The [DOJ] may require firearms dealers to charge each person who obtains a firearm a fee not to exceed five dollars ($5) for each transaction. Revenues from this fee shall be deposited in the Firearms Safety and Enforcement Special Fund.

65.   Section 28300 [12076.5] does not require the DOJ to charge the maximum amount authorized under that statute (*i.e.*, $5), or to even charge *any* fee at all.

**2.   The Handgun Safety Certificate Exam Fee ($15)**

66.   A would-be handgun purchaser must obtain a Handgun Safety Certificate ("HSC") before a handgun may be legally received. Cal. Penal Code § 31615.

67.   To obtain an HSC, a certified instructor (usually the FFL) administers a test for which the certified instructor is charged up to fifteen dollars ($15) by the DOJ.[8] The $15 fee ("HSC Exam fee") is generally charged to the exam taker by the FFL, as allowed by law.

68.   Upon passage of the test, an individual receives an HSC, which is valid for five (5) years, meaning an HSC holder can purchase handguns throughout the 5-year period the HSC is valid without retaking the test or repaying the HSC Exam Fee. Once the HSC expires (after 5 years) the person would have to pay the HSC Exam Fee and pass the exam again before the person could purchase or receive a handgun.

69.   Funds collected from the HSC Exam Fee are placed in the Firearms Safety

---

[8] (Cal. Pen. Code § 31650(c) [12805(e)])

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    and Enforcement Special Fund. *See* Cal. Pen. Code § 31650(d) [12805(f)].

2    70.  Section 31650(c) [12805(e)], the statute conferring authority on DOJ to

3    charge the HSC Exam fee, does not require the DOJ charge the maximum amount

4    authorized under that statute, or to even charge *any* fee at all.

5    **C.   Firearm Safety Account Fee ($1)**

6    71.  Penal Code section 23690 [12088.9] provides:

7           (a)(1) The Department of Justice *may* require each dealer to charge each
     firearm purchaser or transferee a fee not to exceed one dollar ($1) for each
8    firearm transaction.

9           (2) The fee shall be for the purpose of supporting department program
     costs related to this act, including the establishment, maintenance, and
10   upgrading of related database systems and public rosters.

11          (b)(1) There is hereby created within the General Fund the Firearm Safety
     Account.
12
            (2) Revenue from the fee imposed by subdivision (a) shall be deposited
13   into the Firearm Safety Account and shall be available for expenditure by the
     Department of Justice upon appropriation by the Legislature.
14
            (3) Expenditures from the Firearm Safety Account shall be limited to
15   program expenditures as defined by subdivision (a).

16   72.  There is *no* provision in California law *requiring* DOJ to charge this fee at

17   all.

18
     **D.   Legislative History of the DROS Fee and Management of the DROS
19         Special Account**

20   73. The origins of the DROS system and its related fees are believed to go

21   back to sometime in the 1920s.

22   74.  The amount of a DROS fee in and around the year 1990 was $4.25. *See*

23   S.B. 670, 1995-1996 Leg. Sess. (Cal. 1995) (as introduced Feb. 22, 1995).

24   75.  By 1995, the DROS fee had ballooned to $14.00, an increase of greater

25   than 300 percent in less than five years. Id.

26   76.  In 1995, the California Legislature passed Senate Bills 670 and 671 to cap

27   the rate for a DROS fee at $14.00, with increases "at a rate not to exceed any

28   increase in the California Consumer Price Index." That amendment is reflected in

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    Penal Code section 28225(a) [12076(e)] described above.

2        77.   Senate Bill 670 (1995-1996 Reg. Sess. (Cal. 1995) (as enacted) further
3    prohibited the DOJ from using the fee to "directly fund or as a loan to fund any
4    program not specified."

5        78.   In the following years, a trend of appropriating DROS fee revenues to pay
6    for additional activities unrelated to the clearance of the purchaser to buy a firearm
7    or register handguns emerged. A series of bills passed that allowed monies in the
8    DROS Special Account to pay for the ever-expanding list of programs and services
9    found at section 28235 [12076(g)].

10       79.   For example, Assembly Bill 2080 (2002) established a program to address
11   *illegal firearms trafficking* and authorized its funding from the DROS Special
12   Account. *See* Penal Code §§ 27555 [12072(f)(1)], 28235 [12076(g)].

13       80.   Assembly Bill 2580 (2002) specifically amended section 28235
14   [12076(g)] to authorize funding from the DROS Special Account for the
15   inspections of several classes of dangerous weapon permit-holders. *See* Cal. Penal
16   Code §§ 28235 [12076(g)], 12099 [33320] [inspections of short-barreled long gun
17   permit-holders], 32670 [12234] [inspections of machine gun permit-holders],
18   31110 [12289.5] [inspections of "assault weapon" permit-holders], 19000
19   [12305(f)-(g) [inspections of destructive devices permit-holders].

20       81.   Assembly Bill 2902 (2002) specifically amended section 28235
21   [12076(g)] to authorize funding for the maintenance of the Centralized List of
22   Exempted FFLs and the re-testing of handguns deemed "not unsafe." *See* Cal.
23   Penal Code §§ 28235 [12076(g)], 12083[28450 *et seq.* ], 32020 [12131(c)].

24       82.   In 2001, Plaintiff NATIONAL RIFLE ASSOCIATION (NRA) requested
25   the Office of California State Auditor ("CSA") to investigate the DOJ's operation
26   of the DROS program, believing that DROS Special Account funds were being
27   misused.

28       83.   CSA responded to Plaintiff NRA's request, stating that an audit of the

19

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   DROS program could only be conducted by request from the Joint Legislative

2   Audit Committee ("JLAC"). Plaintiff NRA then began working with members of

3   the Legislature to prepare a request to JLAC for an audit.

4      84.  Before Assembly Bill 2080's final passage in 2002, the Office of

5   Legislative Counsel was asked by Senator Bill Morrow to opine on whether

6   Assembly Bill 2080 authorized using DROS fee revenues, paid by individual

7   firearms transferees, to support Assembly Bill 2080's purposes.

8      85.  While awaiting the Office of Legislative Counsel's response to that

9   request, then Assemblyman (now Senator) Rod Wright sought information on the

10  DROS Special Account from the DOJ and Legislative Analyst's Office from the

11  Assembly Budget Committee. A week later, the Assembly Budget Subcommittee

12  on State Administration ordered the DOJ to submit a report on the DROS Special

13  Account status. *See* 2002 Budget Act, Item 0820-001-0460.

14     86.  The first report DOJ submitted to the Assembly Budget Subcommittee on

15  State Administration detailed the status of the DROS Special Account. But no audit

16  of spending was provided.

17     87.  Later that year, the Office of Legislative Counsel responded to Senator

18  Morrow's request regarding expending DROS Fee revenues to support Assembly

19  Bill 2080, with the following analysis:

20  -   Section 28225(b) [12076(e)] provides that the DROS fee be no more than

21      is necessary to reimburse designated program purposes and may not be

22      used to fund any other program;

23  -   Nevertheless, section 28235 [12076(g)] identifies other purposes for

24      which funds in the DROS Special Account may be used;

25  -   Under the rules of statutory construction, section 28235 [12076(g)] refers

26      generally to money in the DROS Special Account, rather than specifically

27      to the revenue from the section 28225(a) [12076(e)] DROS fee;

28  -   Because the DROS Special Account contains funds in addition to fees

20

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    obtained pursuant to 28225(b)(1)-(10) [12076(e)], the purposes of section

2    28235 [12076(g)] may be accomplished without the use of 28225(a)

3    [12076(e)] [DROS] funds;

4    -    Because Assembly Bill 2080 did not amend 28225(a)-(c) [12076(e)] to

5         fund its new purposes, 28235 [12076(g)] could not be construed to

6         authorize the expenditure of DROS fees for any purpose not specified in

7         28225(b) [12076(e)];

8    88.  The Office of Legislative Counsel's response provided its explanation on

9    how it believed 28225(a)-(c) and 28235 [subsections (e) and (g) of section 12076,

10   respectively] could coexist.  Though the Office of Legislative Counsel explained

11   how those sections could coexist, it did not say DOJ was actually limiting

12   expenditures in such a manner.

13   89. The DOJ and the Legislative Analyst's Office then submitted a

14   supplemental report on the status of the DROS Special Account to the Legislature

15   pursuant to the 2002 Budget Act, Item 0820-001-0460. That report summarized the

16   annual DROS Special Account revenues and expenditures, DROS-related

17   programs, DROS application receipt information, the fees then charged, and the

18   average cost of processing each application. Claiming that expert staff and

19   necessary funding were unavailable, however, the report did not provide the

20   necessary comprehensive examination into the DOJ's fee structure to determine

21   whether the DROS fee was recovering actual costs of the DROS program, or what

22   aspects of it, or if adjustments to the amount of the fee were appropriate. DOJ thus

23   conceded that it was expending millions of dollars without information showing

24   that expenditures of funds from the DROS fee were legally authorized.

25   90.  In 2003, Assembly Bill 161 passed, removing the prohibition on using

26   DROS fee revenues to "directly fund or as a loan to fund any program not

27   specified." AB 161 therefore allowed DOJ to use funds collected from firearm

28   transactions for *any* "regulatory and enforcement activit[y] related to the sale,

purchase, loan, or transfer of firearms" regardless of whether the activity related to constitutionally allowable spending.[9]

91.  As Assembly Bill 161 made its way through the legislative process, the bill's sponsor argued that it did not expand the use of revenues from the DROS fee, but merely *clarified* their use.[10]

92.  The Bill Analysis of Assembly Bill 161 also indicates the Legislature relied on the Legislative Counsel's opinion that DROS fee revenues could not be used to fund the activities mandated by Assembly Bill 2080.

93.  The enactment of section 28225(b)(11) [12076(e)(10)] expanded the scope of section 28225(a)-(c) [12076(e)], providing a "catch-all" to ensure that those programs (*i.e.*, those sections listed in section 28235 [12076(g)]) could be supported by revenues from the DROS fee in the DROS Special Account.

94.  Noting that the DOJ's previous reports lacked sufficient detail, on January 26, 2004, Senator Morrow submitted a written request to the JLAC, seeking a formal audit of the DROS Special Account. That request was heard a month later.[11]

95.  A year after Assembly Bill 161 passed and expanded the list of activities that DROS funds could be spent on, the DOJ adopted California Code of Regulations, title 11, section 4001, which increased the cap on DROS Fees as described above in Paragraph 49. No support was provided by DOJ tying the $5

---

[9] Found in current Penal Code section 12076(e)(10) [28225(b)(11)], which was further amended in the 2011 Legislative session by Senate Bill 819 as described below.

[10] *See* Sen. Comm. on Public Safety, Bill Analysis: Dealers Record of Sale Special Account - Expanding Authorized Use - Appropriation to Fund Firearms Trafficking Prevention Act of 2002, at 10 (July 8, 2003) *available at* http://www.leginfo.ca.gov/pub/03-04/bill/asm/ab_0151-0200/ab_161_cfa_20030708_141850_sen_comm.html (last visited Jan. 11, 2012).

[11] PLAINTIFFS have so far been unable to ascertain the vote or outcome of that February 24, 2004 hearing, despite diligent efforts.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

increase of the maximum fee (from $14 to $19) to the California Consumer Price Index to which DROS fee increases are statutorily limited, nor was any support provided by DOJ justifying the $15 fee as necessary to cover its costs relating to the sale of an additional handgun.

96.   California Code of Regulations, title 11, section 4001 remained in effect without any attempts by DOJ to amend it to raise or lower the DROS fee, until 2010 when the DOJ issued a notice of proposed rulemaking stating its intent to *lower* the maximum fee allowed from $19 to the pre-2004 emergency regulation amount of $14.

97.   The 2010 initial statement of reasons concerning the proposed rulemaking indicated that "although the volume of DROS transactions has increased, the average time spent on each DROS, and thus the processing cost, has decreased."[12] It also noted that "[t]he proposed regulations [would] lower the current $19 DROS fee to $14, *commensurate with the actual cost of processing a DROS*." (emphasis added).[13]

98.   Ultimately, the 2010 proposed rulemaking was not adopted, thereby allowing DOJ to continue obtaining an invalid windfall from DROS fee revenues to fund present and future government activities.

99.   After rejection of the proposed decrease in the DROS fee, Plaintiff NRA submitted a request under the California Public Records Act to the DOJ Bureau of Firearms, seeking all writings constituting, referring or relating to (1) the DOJ's policies and procedures for the handling and management of the DROS Special Account since January 1, 2000, and (2) a detailed accounting of the DROS Special Account for the same period.

---

[12]  Cal. Dept. of Justice, Initial Statement of Reasons concerning Proposed DROS Fee Regulations (2010), *available at* http://ag.ca.gov/firearms/regs/DROSisor.pdf (last visited Jan. 11, 2012).

[13]  *Id.*

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

100.  An attorney with the DOJ's Bureau of Firearms responded that there was no present way to compile the information sought, that no current audit of the DROS Special Account exists, that an official audit would be required, and that the Legislature has no money to initiate one.

101.  Plaintiff NRA was provided, however, with a list of services the DOJ Bureau of Firearms provides using monies from the DROS Special Account, a table summarizing the statutory and regulatory authority for the fees charged and services provided, a table summarizing DROS Special Account annual revenues and expenditures since 2001, and a summary of the number of long-gun and handgun transactions for which the DROS fee was collected during the same period.

102.  In 2011, Plaintiff NRA sent the DOJ a follow-up request under the Public Records Act, seeking records explaining what constituted "DROS enforcement activities" as identified in the table DOJ previously disclosed that summarized its purported authority for the fees charged and services provided. Plaintiff NRA also requested other documents, including ledgers identifying individual transactions since 2001. The DOJ again asserted that no such accounting exists, raised numerous privilege grounds, and denied PLAINTIFF NRA's request.

103.  Finally, the California Legislature passed and Governor Brown signed into law Senate Bill 819 (Leno). It is effective as of January 1, 2012. SB 819 again expanded the uses to which DROS fee revenues may be put as described in the findings for amending section 28225 (see paragraphs 50-52 above). DEFENDANTS have admitted SB 819s' purpose and effect of using funds from the DROS fee on activities unrelated to the lawful purchase of a firearm: "To clear the [Armed and Prohibited Persons System] backlog of approximately 34,000 handguns, Attorney General Harris is the sponsor of Senate Bill 819, which would revise the Penal Code to *expand* the use of existing regulatory fees collected by gun dealers to allow the state [DOJ] to use fee revenue to pay for the APPS program."

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Press Release, Office of the Attorney General, Attorney General Kamala D. Harris Announces Seizure of 1,200 Guns from Mentally Unstable and Other Individuals (June 16, 2011) (emphasis added).

104.  The history of the DROS fee is thus one of continuous expansion regardless of surrounding circumstances.

E.   **Legislative History of the Other Challenged Fees and Management of Their Respective Accounts**

1.   **The $1 Fee**

105. The provision providing for the $1 Fee, section 23690 [section 12088.9] did not come into existence until 2002. It was created by California Assembly Bill 106 (1999-2000 Reg. Sess. (Cal. 1999) (as enacted) ("AB 106"). Section 23690 [section 12088.9] was not a part of the changes made by AB 106 when it was introduced by Senators Scott and Aroner. Rather, the bill was originally about prohibiting the unlicensed importing of firearms and requiring that all firearms sold, transferred, or delivered for sale by licensed FFLs be accompanied by a firearm safety device and warning label in order to prevent accidental shootings involving children.

106.  The $1 Fee was not a part of AB 106 until after the bill's fifth amendment, at which time the author decided to include it "for the purpose of supporting various department program costs related to firearms safety and registration." Sen. Comm. on Pub. Safety, Bill Analysis: Firearms - Safety Devices, at 6-7 (June 22, 1999) *available at* http://www.leginfo.ca.gov/pub/ 99-00/bill/asm/ab_0101-0150/ab_106_cfa_19990622_133507_sen_comm.html (last visited Feb. 7, 2012).

2.   **The $5 Fee**

107.  Not satisfied with the revenue generated from the $1 Fee for financing DEFENDANTS' various government programs, barely two years later, the California Legislature passed Senate Bill 52 (2001-2002 Reg. Sess.) ("SB 52"). SB

1   52 created Penal Code section 28300 [12076.5], authorizing DEFENDANTS to

2   charge the $5 Fee in addition to the $1 Fee.

3       108.  Like the $1 Fee and AB 106, when SB 52 was introduced by Senators

4   Scott and Perata it did not include the $5 Fee. Rather, SB 52 was originally aimed

5   at eliminating the basic firearms safety certificate program and replacing it with a

6   handgun safety license (which would come to be the Handgun Safety Certificate).

7   It also contemplated requiring a shooting proficiency demonstration, as well as a

8   safe handling demonstration before a handgun could be purchased.[14]   It was not

9   until SB 52's fifth amendment that the $5 Fee was included.

10      109.  According to the Senate Rules Committee's Bill Analysis of SB 52, "the

11  revenues from [the $5] fee would be deposited in the Firearms Safety and

12  Enforcement Special Fund, created by [SB 52], administered by [Defendant] DOJ,

13  and continuously appropriated to implement and enforce the provisions of this

14  measure."

15      110.  The "provisions of this measure" refer to establishing and maintaining

16  the Handgun Safety Certificate Program (which, as discussed below, was also

17  created by SB 52). *See* Sen. Rules Comm., Bill Analysis: Handgun safety

18  certificate, at 4 (Sept. 10, 2001) *available at* http://www.leginfo.ca.gov/

19  pub/01-02/bill/sen/sb_0051-0100/sb_52_cfa_20010913_101416_sen_floor.html

20  (last visited Feb. 7, 2012).

21      111.  Despite being for the *Handgun* Safety Certificate Program – which, as

22  explained below, is funded by an additional fee charged to handgun purchasers –

23  SB 52 did not differentiate between purchasers of handguns and long-guns in

24  assessing the $5 Fee. It included *long-gun* transactions as subject to the fee as well,

25

26  _____

27  [14]   *See* SB 52 (as introduced Dec. 18, 2000), at 1 *available at*
    http://www.leginfo.ca.gov/pub/01-02/bill/sen/sb_0051-0100/sb_52_bill_20001218_introduced.pdf (last visited Feb. 8, 2012).

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

despite those purchases having nothing to do with *handguns*.

### 3.   The HSC Exam Fee

112.   SB 52 also created section 31650(c) [12805(e)], providing for *another* fee charged to handgun purchasers, the HSC Exam Fee. The rest of then-section 12805 (excluding subsection (e)) was created about a decade earlier by Assembly Bill 618 (1991-1992) ("AB 618").

113.   Prior to the addition of subsection (e), then-section 12805 generally required handgun purchasers to have a "Basic Firearms Safety Certificate" ("BFSC"). *See* Department of Justice Regulations for the Basic Firearms Safety Certificate Program, http://www.ag.ca.gov/firearms/regs/bfsc.pdf.

114.   To obtain a BFSC, one had to pass an exam with a *one-time* fee of $10 (with an additional $10 charged to the test administrator, generally the FFL). The certificate was valid forever, with no renewal fees required (unless it was lost). *Id.*

115.   SB 52's replacement of the BFSC program with section 31650(c) [12805(e)] (*i.e.*,the current HSC Program) resulted in the fee to take the required exam to be eligible to receive a handgun being raised to $15, the certificate for passing the exam going from having no expiration date to being valid only for five years, and the elimination of the exception to the certificate requirement for honorably discharged military veterans and those with valid hunting licenses. [15]

116.   In sum, SB 52 made it so more people had to take a required exam more often, and pay more fees.

117.   SB 52 stated that the purpose of the HSC Exam Fee was "to cover the department's cost in carrying out and enforcing [HSC provisions]." See SB 52 as chaptered (Oct. 14, 2001), at 86 available at http://www.leginfo.ca.gov/pub/

---

[15] *See* Department of Justice Regulations for the Basic Firearms Safety Certificate Program, http://www.ag.ca.gov/firearms/regs/bfsc.pdf, at 5-7 (listing the exemptions to the former Basic Firearms Safety Certificate and the authority for those exemptions).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

01-02/bill/sen/sb_0051-0100/sb_52_bill_20011014_chaptered.html (last visited Feb. 7, 2012). But the California Penal Code currently allows the HSC Exam Fee to fund regulations of "deadly weapons," including not only handguns and long-guns, but also "unsafe handguns," machine guns, "assault weapons," destructive devices, ammunition, boobytraps, body armor, tear gas, silencers, switchblade knives, and "less lethal devices," among others. *See* Cal. Penal Code § 28300(b).

118.  This phenomenon of creating and expanding the scope of these other fees charged to firearm purchasers appears to have chronologically paralleled with the similar increase of the DROS Fee and expanded uses of that fee's revenues.

## GENERAL ALLEGATIONS

119.  All of the above paragraphs are re-alleged and incorporated herein by reference.

120.  Individual PLAINTIFFS BAUER, WARKENTIN, HACKER, FERRY, and ADLEY, and those persons represented by organizational PLAINTIFFS NRA and CRPA FOUNDATION, have each been required to pay, have in fact paid, and expect to pay in the future each of the Challenged Fees as currently required by California law before taking possession of firearms purchased from an FFL or transferred through an FFL as a private party transfer.

121.  The funds from the Challenged Fees PLAINTIFFS paid and expect to pay are ultimately surrendered to DEFENDANTS' control, and purportedly deposited into the respective account established for each Challenged Fee as required by California law.

## I.  Defendants' Imposition of the Challenged Fees as a Prerequisite to the Exercise of a Constitutional Right Is Unlawful

122.  The fundamental right to possess firearms under the Second Amendment includes a corresponding right to acquire a firearm.

123.  The Challenged Fees, which DEFENDANTS generally require be paid before a purchaser can acquire a firearm, are unconstitutional prerequisites on the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

exercise of the fundamental right to acquire a firearm freely granted by the United States Constitution because DEFENDANTS impose them in excessive amounts and use the resulting windfall revenues to fund activities beyond their valid regulatory costs.

124.  The historical and continual increase and improper utilization of the Challenged Fees by DEFENDANTS for ever expanding improper purposes, necessitates judicial action to halt infringements and violations of PLAINTIFFS' constitutional rights.

### A.   Defendants Use Revenues from the Challenged Fees Unlawfully

125.  DEFENDANTS unconstitutionally impose the Challenged Fees for the purpose of funding, and in fact do fund, activities which are "unrelated to the scope of the activities of [the fee payer]" (*i.e.*, Plaintiffs')] and which do not even bear a reasonably sufficient nexus to any legitimate regulation of the fee payers' lawful firearm transactions.

126. DEFENDANTS spend revenues from the Challenged Fees on activities that the Penal Code authorizes, but which have no reasonable relation to regulating lawful firearm purchases.

127.  Law-abiding firearm purchasers like PLAINTIFFS are not just being required to internalize the full social costs of their choice to exercise their fundamental Second Amendment rights, but also those costs of choices *made by others*, including special weapon permittee holders (e.g., machine gun permits) and criminal users of *completely unrelated* firearms – much as if, for instance, all lawful abortion patients had to pay a fee subsidizing specific abortion procedures they do not support or that are not lawfully available to them, or to finance law enforcement programs cracking down on illegal abortion operations.

128.  The costs incurred by DEFENDANTS in processing, issuing, and policing special weapon permits and conducting general law enforcement operations cannot constitutionally fall on the shoulders of PLAINTIFFS and other

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    lawful firearm purchasers via a fee.

2        129.  DEFENDANTS cause PLAINTIFFS irreparable harm by choosing to

3    spend revenues obtained from the Challenged Fees on activities not reasonably

4    related to regulating lawful firearms transactions.

5        **B.    The Challenged Fees Are Unconstitutionally Excessive**

6        130.  Regardless of whether any of the Challenged Fees are reasonably related

7    to regulating lawful firearm purchasers like PLAINTIFFS, each is nevertheless

8    unconstitutionally excessive because the Challenged Fees are fixed in an amount

9    not calculated to defray DEFENDANTS' expenses of policing the fee payers' (*i.e.*,

10   Plaintiffs') lawful firearm transactions, but rather are collected to fund general law

11   enforcement activities that should be funded by the whole public.

12       131.  DEFENDANTS currently require all persons not statutorily exempt to

13   pay each of the applicable Challenged Fees in the maximum amount allowed by

14   statute before they can receive a firearm.[16]

15       132.  There is nothing requiring DOJ to charge the maximum amount

16   *statutorily* allowed for any of the Challenged Fees, as the DOJ has the discretion to

17   impose them in the first place (or a lesser amount commensurate with covering its

18   actual, valid regulatory costs).

19       133.  DEFENDANTS do not exercise their statutorily-conferred authority to

20   lower the amount charged for any of the Challenged Fees.

21       134.  Each of the amounts DEFENDANTS have chosen to charge for the

22   Challenged Fees exceeds the amount necessary to reimburse the DOJ for the costs

23   of furthering any of DEFENDANTS' valid regulatory activities as to lawful firearm

24   transactions.

25       135.  There is no reasonable support tying the amounts DEFENDANTS decide

26   to charge for the Challenged Fees to DEFENDANTS' actual, constitutionally valid

27

28
     _____
         [16]  Except the HSC Exam Fee if the transfer does not involve a handgun.
     _____
                                         30
     FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    regulatory costs.

2        136.  The relatively moderate amounts of the fees is not relevant as to whether

3    they are excessive for constitutional purposes; they are excessive because they are

4    more than is necessary for reasonably related regulations.

5        137.  Moreover, the amounts DEFENDANTS charge for the Challenged Fees

6    are not as inoffensive as they may appear when viewed from the perspective of

7    certain Plaintiffs who have spent hundreds of dollars a year on these fees while

8    DEFENDANTS have enjoyed substantial (multi-million dollar) annual surpluses in

9    the accounts into which the funds from the Challenged Fees are deposited, year

10   after year.

11       138.  The surpluses of funds in the Challenged Fees' respective accounts are

12   so high that the Challenged Fees are not set at an amount "reasonably necessary" to

13   cover only valid regulatory programs.

14       139.  Between 2004 and 2010, the DROS Special Account sustained an

15   average surplus exceeding $2 million *annually*.

16       140.  In explaining its proposal to lower the DROS Fee in 2010, the DOJ

17   stated "[t]he proposed regulations [would] lower the current $19 DROS fee to $14,

18   commensurate with the *actual cost* of processing a DROS."[17]

19       141.  DEFENDANTS cause PLAINTIFFS irreparable harm by refusing to

20   exercise their discretion to lower the Challenged Fees to an amount commensurate

21   with covering their valid regulatory costs alone.

22
23   **II.   California Penal Code Sections Authorizing Defendants' Unlawful Use of
     Revenues from the Challenged Fees Are Facially Unconstitutional**

24       142.  Regardless of whether DEFENDANTS do in fact spend revenues from

25   the Challenged Fees on activities not reasonably related to regulating lawful

26   ──────────────────

27       [17]  Cal. Dept. of Justice, Bureau of Firearms, Initial Statement of Reasons
     [Concerning Proposed DROS Fee Rulemaking] (2010), *available at*
28   http://ag.ca.gov/firearms/regs/DROSisor.pdf

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

firearms transactions (PLAINTIFFS maintain that they do as outlined above), the Penal Code sections expressly authorizing such expenditures by DEFENDANTS are facially unconstitutional.

143.   California Penal Code section 28235 [12076(g)] – by expressly authorizing DEFENDANTS' expenditure of DROS fee revenues on the activities listed therein such as inspections of Short-Barreled Long Gun Permit-holders (Cal. Penal Code § 33320 [12099]), retesting of handguns certified as "not unsafe" (Cal. Penal Code § 32020(a) [12131(c)]), inspections of Machine Gun Permit-holders (Cal. Penal Code § 32670 [12234]), inspections of "Assault Weapon" Permit-holders (Cal. Penal Code § 31110 [12289.5]), and inspections of Destructive Device Permit-holders (Cal. Penal Code § 18910 [12305(f)-(g)]) – unlawfully places the burden of funding activities not reasonably related to regulating lawful firearms transactions on people like PLAINTIFFS exercising their constitutional right to lawfully purchase a firearm, instead of the general public. It is thus invalid on its face.

144.   California Penal Code section 28225 – by subsection (b)(11) thereof [12076(e)(10)] expressly authorizing DEFENDANTS' expenditure of DROS fee revenues on general law enforcement activities regulating the unlawful possession of firearms, including "assault weapons" – unlawfully places the burden of funding activities not reasonably related to regulating lawful firearms transactions on people like PLAINTIFFS exercising their constitutional right to lawfully purchase a firearm, instead of the general public. It is thus invalid on its face.

145.   Activities regulating the *unlawful* possession of firearms are not reasonably related to the regulation of *lawful* firearm purchases– especially "assault weapons" which PLAINTIFFS are generally prohibited from obtaining under

California law[18] – and thus cannot constitutionally be funded by fees paid by lawful firearm purchasers like PLAINTIFFS.

146.  California Penal Code Sections 31650 [12805(e)] and 28300 [12076.5(b)] – by their respective subsection (c) expressly authorizing DEFENDANTS' expenditure of the revenues from their respective fees (the HSC Exam Fee and $5 Fee) on enforcing general criminal laws, including laws regulating machine guns, "assault weapons," destructive devices, tear gas, silencers, etc. – unlawfully place the burden of funding activities not reasonably related to regulating lawful firearms transactions on people like PLAINTIFFS exercising their constitutional right to lawfully purchase a firearm, instead of the general public. Both statutes are thus invalid on their face.

147.  Despite being, at least in part, for the purpose of "implementing and enforcing" the *Handgun* Safety Certificate Program (*i.e.*, the "provisions of Article 2" mentioned in Section 28300(b)), the $5 Fee is charged to purchasers of *long-guns* as well, some of whom may not even own, or wish to own, a handgun.

## DECLARATORY JUDGMENT ALLEGATIONS

148.  There is an actual and present controversy between the parties hereto in that PLAINTIFFS contend that the manner in which DOJ currently imposes the Challenged Fees is unlawful. DEFENDANTS have chosen and continue to choose to require lawful firearm purchasers, including PLAINTIFFS, to pay the maximum amount statutorily allowed for each of the Challenged Fees.

149.  PLAINTIFFS desire a judicial declaration of their rights and DEFENDANTS' duties; namely, that the manner in which DOJ currently imposes the Challenged Fees infringes on PLAINTIFFS' Second Amendment rights.

---

[18] *See generally* Cal. Penal Code §§ 30500-31115 [12275-12290] (also known as the Roberti-Roos Assault Weapons Control Act of 1989 and the .50 Caliber BMG Regulation Act of 2004).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# INJUNCTIVE RELIEF ALLEGATIONS

150.  If an injunction does not issue enjoining DEFENDANTS from imposing each of the Challenged Fees as currently imposed, PLAINTIFFS will be irreparably harmed. PLAINTIFFS have been, are presently, and will continue to be injured by the assessment of the Challenged Fees insofar as they constitute unreasonable and unrelated preconditions on the exercise of PLAINTIFFS' Second Amendment rights.

151.   If not enjoined by this Court, DEFENDANTS will continue to enforce the Challenged Fees in derogation of PLAINTIFFS' Second Amendment rights.

152.  If an injunction does not issue enjoining DEFENDANTS from enforcing Penal Code sections 28225, 28235, 28300, and 31650, PLAINTIFFS will be irreparably harmed. PLAINTIFFS are presently and continuously injured by the enforcement of these sections insofar as such enforcement allows revenues from assessments charged solely to lawful firearm purchasers to be utilized for purposes not reasonably related to valid regulations of lawful firearm transactions.

153.  PLAINTIFFS have no adequate remedy at law. Damages are indeterminate or unascertainable and, in any event, would not fully redress any harm suffered by PLAINTIFFS as a result of DEFENDANTS subjecting PLAINTIFFS to the illegal Challenged Fees as a precondition to exercise their constitutional right to acquire firearms.

154.  Injunctive relief would eliminate PLAINTIFFS' irreparable harm and allow PLAINTIFFS to acquire firearms free from the unlawful Challenged Fees in accordance with their rights under the Second and Fourteenth Amendments.

155.  Accordingly, injunctive relief is appropriate.

/ / /

/ / /

/ / /

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**FIRST CLAIM FOR RELIEF:**
**VALIDITY OF DEFENDANTS' IMPOSITION OF CHALLENGED FEES**
**Violation of the Second Amendment Right to Keep and Bear Arms**
**(U.S. Const., Amends. II and XIV)**
**(By All Plaintiffs Against All Defendants)**

156.  All of the above paragraphs are re-alleged and incorporated herein by reference.

157.  DEFENDANTS have decided to impose, and continue to impose, the Challenged Fees at an excessive amount beyond what is necessary to defray their valid regulatory expenses, and choose to use the resulting windfall revenues to fund activities not reasonably related to regulating lawful firearms transactions such as those engaged in by PLAINTIFFS.  In doing so, DEFENDANTS are abusing their discretion, applying the Challenged Fees in an unconstitutional manner, and propagating customs, policies, and practices that infringe on PLAINTIFFS' right to acquire firearms as guaranteed by the Second and Fourteenth Amendments.

158.  DEFENDANTS cannot satisfy their burden of justifying these customs, policies, and practices that infringe PLAINTIFFS' rights.

159.  PLAINTIFFS are entitled to declaratory and injunctive relief against DEFENDANTS and their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, enjoining them from engaging in such customs, policies, and practices.

**SECOND CLAIM FOR RELIEF:**
**FACIAL VALIDITY OF CALIFORNIA PENAL CODE SECTIONS 28235,**
**28300, 31650, & 28225**
**Violation of the Second Amendment Right to Keep and Bear Arms**
**(U.S. Const., Amends. II and XIV)**
**(By All Plaintiffs Against All Defendants)**

160.  All of the above paragraphs are re-alleged and incorporated herein by reference.

161.  By their provisions expressly authorizing DOJ to use revenues from the Challenged Fees to fund activities not reasonably related to regulating the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

constitutionally protected activity of lawful firearms transactions such as those engaged in by PLAINTIFFS, California Penal Code sections 28225, 28235, 28300, and 31650 are unconstitutional on their face.

162.  PLAINTIFFS are entitled to declaratory and permanent injunctive relief against DEFENDANTS, and any of their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, enjoining them from enforcing, or acting pursuant to, California Penal Code sections 28225, 28235, 28300, and 31650.

## PRAYER

WHEREFORE PLAINTIFFS pray for relief as follows:

1) For a declaration that the Challenged Fees as currently imposed by DEFENDANTS infringe upon the right to acquire firearms protected by the Second Amendment, as incorporated into the Fourteenth Amendment, by impermissibly preconditioning the exercise of that right on the payment of excessive fees, the revenues from which are being used to fund activities not reasonably related to regulating lawful firearms transactions such as those engaged in by PLAINTIFFS, and that as such are invalid and cannot be lawfully imposed;

2) For a preliminary and permanent prohibitory injunction forbidding DEFENDANTS and their agents, employees, officers, and representatives from imposing the Challenged Fees without first limiting the activities for which the fees' revenues are used to only those activities reasonably related to regulating lawful firearm purchasers like PLAINTIFFS, *and* reducing their amounts to be commensurate with the *actual costs* of those activities.

3)  For a declaration that California Penal Code sections 28225, 28235, 28300, and 31650 violate the Second Amendment on their face.

4)  For a preliminary and permanent prohibitory injunction forbidding DEFENDANTS and its agents, employees, officers, and representatives, from enforcing, or acting pursuant to, California Penal Code sections 28225, 28235,

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   28300, or 31650.

2       6) For remedies available pursuant to 42 U.S.C. § 1983 and for an award of

3   reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988,

4   and/or other applicable state and federal law;

5       7) For such other and further relief as may be just and proper.

6     Dated: February 9, 2012                  Michel & Associates, P.C.

7

8                                  /s/ C. D. Michel

9                                  C. D. Michel
    Attorney for the Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN  DISTRICT OF CALIFORNIA

# FRESNO BRANCH COURTHOUSE

|  |  |
|---|---|
| BARRY BAUER, STEPHEN WARKENTIN, NICOLE FERRY, LELAND ADLEY, JEFFREY HACKER, NATIONAL  RIFLE ASSOCIATION OF AMERICA, INC.,  CALIFORNIA RIFLE PISTOL ASSOCIATION FOUNDATION, HERB BAUER SPORTING GOODS, INC.<br><br>　　　　　Plaintiffs<br><br>　　　　vs.<br>KAMALA HARRIS, in Her Official Capacity as Attorney General For the State of California; STEPHEN LINDLEY, in His Official Capacity as Acting Chief for the California Department of Justice, and DOES 1-10.<br><br>　　　　　Defendants. | **CASE NO.: CV-09-2143-RS**<br><br>**CERTIFICATE OF SERVICE** |

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 E. Ocean Blvd., Suite 200, Long Beach, California, 90802.

I am not a party to the above-entitled action. I have caused service of:
**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF42 U.S.C. sections 1983, 1988**
on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them. Electronically filed documents have been served conventionally by the filer to:

| | |
|---|---|
| Kimberly Granger, Deputy Attorney General Office of the Attorney General 1300 I Street Sacramento, CA 95814 | Kamala Harris, in her official capacity as Attorney General 1300 I Street Sacramento, CA 95814 Stephen Lindley, in his official capacity as Acting Chief for the California Department of Justice 4949 Broadway Sacramento, CA 95814 |

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 9, 2012.

　　　　　　　　　　　　　/S/
　　　　　　　　　　　　C. D. Michel
　　　　　　　　　　　　Attorney for Plaintiffs

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF