KAMALA D. HARRIS
Attorney General of California
STEPAN A. HAYTAYAN
Supervising Deputy Attorney General
ANTHONY R. HAKL, State Bar No. 197335
Deputy Attorney General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA  94244-2550
  Telephone:  (916) 322-9041
  Fax:  (916) 324-8835
  E-mail:  Anthony.Hakl@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BARRY BAUER, STEPHEN WARKENTIN, NICOLE FERRY, LELAND ADLEY, JEFFREY HACKER, NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., CALIFORNIA RIFLE AND PISTOL ASSOCIATION FOUNDATION, HERB BAUER SPORTING GOODS, INC.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**KAMALA HARRIS, in Her Official Capacity as Attorney General of the State of California; STEPHEN LINDLEY, in His Official Capacity as Acting Chief for the California Department of Justice, and DOES 1-10,**<br><br>Defendants. | Case No. 1:11-cv-1440-LJO-MJS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**<br><br><br>Date:  February 26, 2014<br>Time:  8:30 a.m.<br>Dept.:  4, 7th Floor<br>Judge:  Hon. Lawrence J. O'Neill<br>Trial Date:  March 24, 2015<br>Action Filed:  August 25, 2011 |

1

**TABLE OF CONTENTS**

2

**Page**

3

Factual and Legal Background...................................................................................................... 1

4

      I.     Procedural History ......................................................................................... 1

      II.    California Firearms Laws............................................................................... 2

5

            A.    Dealer's Record of Sale Transactions and Related Fees............................ 2

6

            B.    California's Armed Prohibited Persons System......................................... 3

            C.    California Senate Bill 819................................................................................ 5

7

            D.    California Senate Bill 140................................................................................ 6

8

      III.   Description of Parties..................................................................................... 7

9

            A.    Defendants...................................................................................................... 7

            B.    Plaintiffs ......................................................................................................... 7

10

      IV.   Plaintiffs' Claim for Relief ............................................................................ 8

11

Argument .................................................................................................................................... 9

12

      I.     Legal Standards Applicable to Motions for Summary Judgment ......................... 9

      II.    The Second Amendment. ................................................................................ 10

13

      III.   Defendants Use of DROS Fee Revenues to Fund the APPS Program Does

14

              Not Violate the Second Amendment....................................................... 11

Conclusion ................................................................................................................................. 15

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

1

# TABLE OF AUTHORITIES

2

**Page**

3

C ASES

4

*Anderson v. Liberty Lobby*
5
    477 U.S. 242 (1986) ..................................................................................................... 9

6
*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986) ..................................................................................................... 9

7

8
*Cox v. New Hampshire*
    312 U.S. 569 (1941) ............................................................................................... 11, 12

9
*District of Columbia v. Heller*
    554 U.S. 570 (2008) .................................................................................. 10, 11, 12, 14
10

11
*Heller v. District of Columbia*
    698 F.Supp.2d 179 (D.D.C. 2010), *rev'd in part on other grounds*, 670 F.3d 1244,
12
    2011 WL 4551558 (D.C. Cir. Oct. 4, 2011) ........................................................... 12

13
*Jones v. Lodge at Torrey Pines Partnership*
    42 Cal.4th 1158 (2008) ............................................................................................... 5
14

15
*Justice v. Town of Cicero*
    827 F.Supp.2d 835 (N.D.Ill. 2011) .................................................................... 12, 14

16
*Kwong v. Bloomberg*
17
    723 F.3d 160 (2d Cir. 2013) *cert. denied sub nom. Kwong v. de Blasio*, 134 S. Ct.
    2696 (2014) ............................................................................................................... 12
18

19
*Louis v. McCormick & Schmick Restaurant Corp.*
    460 F. Supp. 2d 1153 (C.D. Cal. 2006)...................................................................... 5

20
*McDonald v. City of Chicago*
    561 U.S. 742, 130 S.Ct. 3020 (2010) ......................................................... 10, 11, 12
21

22
*Murdock v. Pennsylvania*
    319 U.S. 105 (1943)............................................................................................. 11, 14
23

24
*Robi v. Five Platters, Inc.*
    918 F.2d 1439 (9th Cir. 1990)................................................................................... 10

25
*Southern California Gas Co. v. Santa Ana*
    336 F.3d 885 (9th Cir. 2003)....................................................................................... 9
26

27
*Southern Oregon Barter Fair v. Jackson County, Oregon*
    372 F.3d 1128 (9th Cir. 2004)................................................................................... 11

28

ii

# TABLE OF AUTHORITIES
**(continued)**

**Page**

*Souvannarath v. Hadden*
  95 Cal.App.4th 1115 (2002).................................................................................................. 5

*Turner Broad. Sys., Inc. v. FCC*
  520 U.S. 180 (1997) ........................................................................................................... 14

*Van Horn v. Watson*
  45 Cal.4th 322 (2008) .......................................................................................................... 5

*Wang Laboratories, Inc. v. Mitsubishi Electronics, America, Inc.*
  860 F. Supp. 1448 (C.D. Cal. 1993) ................................................................................... 10

**STATUTES**

42 U.S.C. § 1983 .................................................................................................................... 1

California Code of Regulations, Title 11, § 4001 ................................................................... 2

iii

1

**TABLE OF AUTHORITIES**
**(continued)**

2

**Page**

3    Penal Code

    § 11106 ................................................................................................................... 2

4        § 16580 ................................................................................................................ 6, 13

    § 23690 ................................................................................................................... 2

5        § 26500 ................................................................................................................... 2

    § 26815 ................................................................................................................... 2

6        § 28100 ................................................................................................................... 2

    § 28155 ................................................................................................................... 2

7        § 28160 ................................................................................................................... 2

    § 28205 ................................................................................................................... 2

8        § 28220 ................................................................................................................... 2

    § 28225 ....................................................................................................... 2, 3, 5, 6

9        § 28225(a) .............................................................................................................. 3

10       § 28225(b)(1) .......................................................................................................... 6

    § 28225(b)(2) .......................................................................................................... 6

11       § 28225(b)(3)-(9) .................................................................................................... 6

    § 28225(b)(10) ........................................................................................................ 6

12       § 28225(b)(11) ......................................................................................... 1, 6, 8, 13

13       § 28230 ................................................................................................................ 2, 3

    § 28235 ................................................................................................................ 2, 3

14       § 28240 ................................................................................................................... 2

    § 28240(a) .............................................................................................................. 3

15       § 28240(b) .............................................................................................................. 3

16       § 28300 ................................................................................................................... 2

    § 28460 ................................................................................................................... 3

17       § 29510 ................................................................................................................... 3

18       §§ 30000-300015 .................................................................................................. 13

    § 30000 ................................................................................................................ 3, 4

19       § 30000(a) .............................................................................................................. 4

    § 30000(b) .............................................................................................................. 4

20       § 30005 ................................................................................................................... 4

    § 30010 ................................................................................................................... 4

21       § 30015 ................................................................................................................... 7

    § 30015(a) .............................................................................................................. 7

22       § 30900 ................................................................................................................... 3

23       § 30905 ................................................................................................................... 3

    § 33860 ................................................................................................................... 3

24

25   **COURT RULES**

26   Federal Rules of Civil Procedure, Rule 56(c) ................................................................ 9

27   Federal Rules of Evidence, Rule 201 ............................................................................ 5

28

1

**INTRODUCTION**

2    Plaintiffs, a group of individuals and organizations promoting the right to keep and bear

3 arms, seek an order from this Court that would effectively de-fund California's Armed Prohibited

4 Persons System (APPS) program. APPS, administered by the California Department of Justice

5 (DOJ), is a critically-important program that each year recovers thousands of firearms from

6 persons prohibited from possessing them due to criminal behavior or mental illness.

7    According to plaintiffs, the Second Amendment prohibits defendants Kamala D. Harris, the

8 Attorney General of California, and Stephen Lindley, Chief of the Bureau of Firearms of DOJ

9 from expending the revenues of a $19.00 firearms transaction fee on the APPS program. But the

10 relevant state law, California Penal Code section 28225(b)(11), broadly provides that the $19.00

11 fee is intended to cover "the costs associated with funding Department of Justice firearms-related

12 regulatory and enforcement activities related to the sale, purchase, possession, loan, or transfer of

13 firearms . . . ." The Constitution does not prohibit charging and using a fee for those purposes.

14    Accordingly, the claim advanced by plaintiffs has no merit. This Court should grant

15 defendants motion for summary judgment in its entirety.

16

**FACTUAL AND LEGAL BACKGROUND**

17 **I.    PROCEDURAL HISTORY.**

18    Plaintiffs initiated this action for declaratory and injunctive relief under 42 U.S.C. section

19 1983 by filing a complaint on August 25, 2011. (Doc. no. 2.) They filed a first amended

20 complaint on February 9, 2012. (Doc. no. 12.)

21    In 2013, the California Legislature passed Senate Bill 140, which was a development in

22 state law that materially affected the nature of plaintiffs' case. (*See* Doc. 32 at 2.) Accordingly,

23 on July 24, 2013, plaintiffs filed a second amended complaint, which is now the operative

24 pleading in this case. (Doc. no. 37.)

25    Plaintiffs served a significant amount of written discovery on defendants, including two sets

26 of requests for production of documents; two sets of interrogatories; and requests for admission.

27 Defendants responded to that discovery. (*See* Decl. of Anthony Hakl in Supp. of Defs.' Mot. for

28

1

1   Summ. J. ("Hakl Decl."), Exhs. A-E.)  Plaintiffs also took the deposition of defendant Stephen

2   Lindley, a transcript of which has been provided to the Court.  (*See* Hakl Decl. ¶ 7.)

3        This matter is now before the Court on cross-motions for summary judgment.  The parties

4   agree that such motions can resolve the case.

5   **II.   CALIFORNIA FIREARMS LAWS.**

6        **A.   Dealer's Record of Sale Transactions and Related Fees.**

7        When an individual purchases a firearm in California, state law generally requires that the

8   individual make the purchase through a licensed California firearms dealer.  Cal. Penal Code

9   § 26500.[1]  State law also requires that the purchaser provide certain personal information on a

10  Dealer's Record of Sale (DROS) document that the firearms dealer submits to the California

11  Department of Justice (DOJ).  *See* §§ 28100, 28155, 28160 & 28205.

12       California law requires a mandatory 10-day waiting period before the firearms dealer can

13  deliver the firearm to the purchaser.  § 26815.  During the waiting period, DOJ conducts a

14  firearms eligibility background check to ensure the purchaser is not legally prohibited from

15  possessing firearms.  § 28220.  DOJ retains information regarding the sale or transfer of the

16  firearm in the Automated Firearms System (AFS), a database maintained by DOJ.  § 11106.

17  Generally speaking, AFS contains information about registered firearms, such as information

18  regarding the person to who owns a particular firearm and whether the firearm is lost, stolen,

19  found, under observation, destroyed, retained for official use, or held in evidence while a case is

20  pending.  § 11106.

21       In general, an individual purchasing a firearm from a licensed dealer must pay $25.00 in

22  fees.  The majority of that sum consists of a statutory $19.00 DROS fee intended to reimburse

23  DOJ for specified costs, which are discussed further below.  *See* § 28225, Cal. Code. Regs.

24  Tit. 11, § 4001; *see also* §§ 28230, 28235 & 28240.  This $19.00 fee is at the heart of this case.[2]

25       [1] All further statutory citations are to the California Penal Code unless otherwise
    indicated.

26

27       [2] The other fees included in the $25.00 figure, but not at issue in this case, are a $1.00 fee
    that is deposited in the Firearms Safety Account, *see* § 23690, and a $5.00 fee that is deposited
    into the Firearms Safety and Enforcement Fund, *see* § 28300.

28

2

1    The Legislature first set the DROS fee at $14.00 by statute in 1995.  (*See* SB 670, Ch. 901,

2    1995, § 1.)  It remained that amount for about a decade.  In 2004, DOJ adopted regulations

3    adjusting the fee based on the California Consumer Price Index, as permitted by the relevant

4    statute.  § 28225(a) ("The Department of Justice may require the dealer to charge each firearm

5    purchaser a fee not to exceed fourteen dollars ($14), except that the fee may be increased at a rate

6    not to exceed any increase in the California Consumer Price Index as compiled and reported by

7    the Department of Industrial Relations.").  The current $19.00 fee is reflected in a regulation that

8    reads as follows:  "As authorized pursuant to sections 28225, 28230 and subdivisions (a) and (b)

9    of section 28240 of the Penal Code, the [DROS] fee is $19 for one or more firearms (handguns,

10   rifles, shotguns) transferred at the same time to the same transferee."  Cal. Code. Regs. Tit. 11,

11   § 4001.

12       Without the 2004 fee adjustment, the Dealer's Record of Sale Special Account was

13   projected to run out of cash to support the former Division of Firearms' (now Bureau) regulatory

14   and enforcement programs.  (*See* Hakl Decl., Exh. B at AG-00250.)  The Dealer's Record of Sale

15   Special Account is the name of the state fund created by the Legislature into which all DROS fees

16   collected as a result of firearms transactions are deposited.  § 28235 ("[a]ll moneys received by

17   the department pursuant to this article shall be deposited in the Dealer's Record of Sale Special

18   Account of the General Fund, which is hereby created").  By law, a number of other state

19   firearms fees are deposited into the same account.[3]

20       Typical of any state fund, money in the DROS Special Account remains there unless the

21   Legislature appropriates some or all of it out of the fund.  *See* § 28235 (moneys available "upon

22   appropriation by the Legislature").

23       **B.    California's Armed Prohibited Persons System.**

24       The California Legislature established the Armed Prohibited Persons System (APPS) in

25   2001.  § 30000.  That legislation established an electronic system within DOJ to cross-reference

26       [3] *See*, *e.g.*, § 28460 ($115 annual fee to cover costs of maintaining centralized list of
exempted federal firearms licensees); § 29510 ($104 entertainment firearms permit program fee);
27   § 30900 ($20 fee for registering assault weapon ); § 30905 ($25 fee for registering .50 BMG
rifle); § 33860 ($20 fee for processing requests to return firearms).
28

3

Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment
(1:11-cv-01440-LJO-MJS)

1   AFS (which is part of the Consolidated Firearms Information System (CFIS)) with databases

2   containing records regarding persons prohibited from owning firearms and produce a list of

3   armed prohibited persons. *Id.* In general, prohibited persons are those who have been convicted

4   of a felony or a violent misdemeanor, are subject to a domestic violence restraining order, or have

5   been involuntarily committed for mental health care. § 30005.

6        On a daily basis, the APPS system reconciles AFS – the database containing sales

7   information retained by DOJ as a result of the DROS process – against databases housing

8   California's criminal history, domestic violence restraining orders, wanted persons, and the On-

9   Line Mental Health Firearms Prohibition Reporting System. *See* § 30000(a); (February 21, 2014

10  Deposition Testimony of Stephen Lindley ("Lindley Depo.") at 134:19-22.) The system produces

11  a list of armed prohibited persons, and DOJ staff check the list for accuracy. (Lindley Depo. at

12  138:8-21.) Law enforcement officers throughout California can access the APPS list 24 hours a

13  day, 7 days a week, through the California Law Enforcement Telecommunications System

14  (CLETS). *See* § 30000(b); *see also* § 30010 ("The Attorney General shall provide investigative

15  assistance to local law enforcement agencies to better ensure the investigation of individuals who

16  are armed and prohibited from possessing a firearm.") As of January 15, 2015, there were 17,791

17  active individuals identified on the APPS list as currently armed and prohibited in California.

18  (Decl. of Stephen Lindley in Supp. of Defs.' Mot. for Summ. J. ("Lindley Decl.") ¶ 4.) A total of

19  34,689 handguns and 1,441 assault weapons are associated with these individuals. (*Id.*)

20        As mentioned above, California's DROS system operates to prevent the sale or transfer of a

21  firearm when a licensed firearms dealer submits a request for a background check for a prohibited

22  person. DOJ uses the APPS list to conduct enforcement actions that result in the seizure of

23  firearms in the possession of prohibited persons. (Lindley Depo. at 10:13-17.) DOJ's Bureau of

24  Firearms currently has 58 peace officers who are dedicated to APPS enforcement. (Lindley Decl.

25  ¶ 3.)[4] In the past three years, these agents have conducted more than 13,000 APPS cases,

26

27        [4] At the time of defendant Lindley's February 21, 2014 deposition, approximately 45 of
    these 69 positions were filled. (Lindley Depo. at 91:18-92:13.)

28
                                              4

1    resulting in the seizure of the more than 8,000 firearms (Lindley Decl. ¶ 3 & 9.)  DOJ's APPS

2    program is the only one of its kind in the United States.  (Lindley Depo. at 185:5-11.)

3        **C.    California Senate Bill 819.**

4        The APPS program went into effect around 2006, at which time APPS was funded through

5    moneys appropriated from the General Fund.  But with the passage of Senate Bill 819 in 2011,

6    the Legislature clarified that the APPS program could be funded with the DROS fees deposited

7    into the Dealer's Record of Sale Special Account.  *See* Assem. Com. on Appropriations, Analysis

8    of Senate Bill No. 819 (2011-2012 Reg. Sess.) July 16, 2011; Sen. Com. on Public Safety,

9    Analysis of Senate Bill No. 819 (2011-2012 Reg. Sess.) April 26, 2011; (Lindley Depo. at 42:11-

10   18, 56:17-58:25.)[5]  As the Legislative Counsel's digest explained at the time:

11       Existing law authorizes the Department of Justice to require a firearms dealer to
         charge each firearm purchaser a fee, as specified, to fund various specified costs in
12       connection with, among other things, a background check of the purchaser, and to
         fund the costs associated with the department's firearms-related regulatory and
13       enforcement activities related to the sale, purchase, loan, or transfer of firearms.

14
         The bill would make related legislative findings and declarations.
15       This bill would also authorize using those charges to fund the department's
         firearms-related regulatory and enforcement activities related to the possession of
16       firearms, as specified.

17   Cal. Senate Bill 819 (Leno), Stats. 2011, 743 (Leg. Counsel's digest).[6]

18       Thus, with SB 819 the Legislature amended the DROS fee statute (i.e., section 28225) to

19   include the costs of enforcement activities related to firearms possession.  To explain further,

20

21       [5] This legislative history cited here is attached to the declaration of Joel Tochterman filed
     in support of this motion.  "Under Rule 201 of the Federal Rules of Evidence, the court may take
22   judicial notice of the records of state courts [and] the legislative history of state statutes."  *Louis v.
     McCormick & Schmick Restaurant Corp.*, 460 F. Supp. 2d 1153, 1155, n.4 (C.D. Cal. 2006).
23   Defendants requests that this Court do so.

24       [6] This Legislative Counsel's digest is also attached to the Declaration of Joel Tochterman.
     "Although the Legislative Counsel's summary digests are not binding, they are entitled to great
25   weight."  *Van Horn v. Watson*, 45 Cal.4th 322, 332, fn. 11 (2008); *accord Jones v. Lodge at
     Torrey Pines Partnership*, 42 Cal.4th 1158, 1170 (2008).  The Legislative Counsel's digest
26   "constitutes the official summary of the legal effect of the bill and is relied upon by the
     Legislature throughout the legislative process," and thus "is recognized as a primary indication of
27   legislative intent."  *Souvannarath v. Hadden*, 95 Cal.App.4th 1115, 1126, fn. 9 (2002).

28
                                                  5

1     prior to SB 819 the relevant provision of section 28225 provided that the DROS fee shall be no

2     more than is necessary to fund DOJ for, among other things:

3
4            [T]he costs associated with funding Department of Justice firearms-related
             regulatory and enforcement activities related to the sale, purchase, loan, or transfer
             of firearms pursuant to any provision listed in Section 16580.

5     § 28225(b)(11).  As a result of SB 819, the provision now states that the DROS fee shall be no

6     more than is necessary to fund DOJ for:

7
8            [T]he costs associated with funding Department of Justice firearms-related
             regulatory and enforcement activities related to the sale, purchase, *possession*,
             loan, or transfer of firearms pursuant to any provision listed in Section 16580.

9     § 28225(b)(11) (emphasis added).

10

11        Finally, while such provisions were not impacted by SB 819, section 28225 also provides

12    that the DROS fee is designed to fund DOJ "for the cost of furnishing this information," "for the

13    cost of meeting" certain firearms notification obligations under the Welfare and Institutions Code,

14    and "for the costs associated with" certain firearms public education and notification programs.

15    *See* § 28225(b)(1), (2), (10), & (11).  Still other aspects of the statute provide that section 28225

16    is designed to cover certain firearms-related costs incurred by mental health facilities, hospitals,

17    local law enforcement agencies, and other state departments.  *See* § 28225(b)(3)-(9).

18        **D.     California Senate Bill 140.**

19        In 2013, the Legislature passed Senate Bill 140, a bill appropriating $24 million from the

20    DROS Special Account to DOJ to address a growing backlog in APPS.  In relevant part, the

21    Legislature made the following findings and declarations:

22           (c) Each day, the list of armed prohibited persons in California grows by about 15
             to 20 people. There are currently more than 20,000 armed prohibited persons in
23           California. Collectively, these individuals are believed to be in possession of over
             39,000 handguns and 1,670 assault weapons.
24

25           (d) Neither the Department of Justice nor local law enforcement has sufficient
             resources to confiscate the enormous backlog of weapons, nor can they keep up
26           with the daily influx of newly prohibited persons.

27           (e) It is the intent of the Legislature in enacting this measure to allow the
             Department of Justice to utilize additional Dealers' Record of Sale Special
28
                                              6

1
2
> Account funds for the limited purpose of addressing the current APPS backlog and the illegal possession of these firearms, which presents a substantial danger to public safety.

3
Cal. Senate Bill 140 (Leno), Stats. 2013, ch. 2, § 1.

4
5
Thus, the Legislature added to the California Penal Code section 30015, which provides, in relevant part:

6
7
8
> The sum of twenty-four million dollars ($24,000,000) is hereby appropriated from the Dealers' Record of Sale Special Account of the General Fund to the Department of Justice to address the backlog in the Armed Prohibited Persons System (APPS) and the illegal possession of firearms by those prohibited persons.

9
10
11
§ 30015(a).  The Legislature passed SB 140 as an urgency statute "necessary for the immediate preservation of the public peace, health, or safety" and the law went into "immediate effect." Cal. Senate Bill 140 (Leno), Stats. 2013, ch. 2, § 3.

12
**III.   DESCRIPTION OF PARTIES.**

13
**A.     Defendants.**

14
15
16
There are two defendants in this case.  The lead defendant is Kamala D. Harris, the Attorney General of the State of California.  (Second Am. Compl. ¶ 26.)  The Attorney General is sued in her official capacity only.  (*Id*.)

17
18
19
The other defendant is Stephen Lindley, Chief of the California Department of Justice Bureau of Firearms.  (Second Am. Compl. ¶ 27.)  Lindley is also sued in his official capacity only.  (*Id*.)

20
21
22
23
The Attorney General and Lindley are generally responsible for the enforcement of a number of state laws regarding the manufacture, sale, purchase, ownership, possession, loan, and transfer of firearms.  (*See* Second Am. Compl. ¶¶ 26-29.)  These include the laws related to DROS and APPS  (*Id*.)

24
**B.     Plaintiffs.**

25
26
The plaintiffs include two organizations, four individuals, and a firearms dealer.  (*See* Second Am. Compl. ¶¶ 16-25.)

27
28

7

1    The organizational plaintiffs are two gun rights advocacy groups, the National Rifle

2  Association ("NRA") and the California Rifle and Pistol Association Foundation, Inc. ("CRPA").

3  (*See* Second Am. Compl. ¶¶ 20-22.)

4    The individual plaintiffs are Barry Bauer, Stephen Warkentin, Jeffrey Hacker, and Nicole

5  Ferry.  (*See* Second Am. Compl. ¶¶ 16-19.)  Within the last five years, each plaintiff has

6  purchased multiple firearms and paid the DROS fee applicable to each of those transactions.  (*Id.*)

7    Finally, the plaintiffs include a firearms dealer, Herb Bauer Sporting Goods, Inc.  (Second

8  Am. Compl. ¶ 23.)  As a dealer, Herb Bauer Sporting Goods collects DROS fees as required by

9  the laws applicable to firearms transactions.  (*Id.*)

10  **IV.   PLAINTIFFS' CLAIM FOR RELIEF.**

11    Plaintiffs are pursuing a single claim for relief concerning "defendants' use of DROS fee

12  revenues."  (Second Am. Compl. at 15.)  According to the second amended complaint, plaintiffs

13  take issue with defendants' use of those revenues "to fund general law enforcement activities not

14  reasonably related to regulating the behavior or impact on the state of the fee payers."  (*Id.* ¶ 63.)

15  Such use, plaintiffs maintain, violates their "right to acquire firearms as guaranteed by the Second

16  and Fourteenth Amendments."  (*Id.*)

17    In particular, plaintiffs challenge defendants' "use of the revenues generated from the

18  DROS Fee for general law enforcement activities which have no relation to fee payers;

19  specifically, activities associated with the DOJ's Armed Prohibited Persons System program

20  provided for by California Penal Code section 28225(b)(11)."  (Second Am. Compl. ¶ 8.)

21  According to second amended complaint, the "use of revenues generated from the DROS Fee to

22  fund general law enforcement activities associated with the DOJ's APPS program is

23  unconstitutional, because the criminal misuse of firearms is not sufficiently related to the fee

24  payers' activities, i.e., lawful firearm transactions."  (*Id.* ¶ 12.)

25    In their second amended complaint, plaintiffs have also been careful to explain what they

26  are *not* challenging.  Specifically, plaintiffs do not challenge "the legality of imposing the DROS

27  Fee in the first place."  (Second Am. Compl. ¶ 55.)  Nor do they challenge the legality "of the

28  APPS System" itself.  (*Id.*)  Plaintiffs also disavow any claim that "the current DROS fee is

1  excessive." (*Id*. at 4, n.5.)  Finally, plaintiffs do not claim that the DROS fee imposes an

2  unconstitutional burden on the actual exercise of their Second Amendment rights.  In other words,

3  this is not a case where plaintiffs were unable to pay the DROS fee or take possession of firearms.

4  Plaintiffs allege that they have paid the DROS fee on the relevant occasions and have taken

5  possession of the related firearms.  (*Id*. ¶¶ 16-19.)

6      Thus, plaintiffs request for relief is narrow.  They seek a declaration that the "enforcement

7  of the APPS program is not sufficiently related to plaintiffs' lawful firearm purchases so as to

8  justify defendants' using the revenues from the DROS Fee . . . for the purpose of funding the

9  APPS program." (Second Am. Compl. at 15.)  They ask the Court to declare that such use of

10  DROS fee revenues violates plaintiffs' Second Amendment rights "because it improperly requires

11  plaintiffs to bear the burden of financing general law enforcement activities as a precondition to

12  exercising those rights." (*Id*.)  Related, plaintiffs seek an "injunction forbidding defendants . . .

13  from using DROS Fee revenues to fund the APPS program." (*Id*. at 16.)

14                                   **ARGUMENT**

15  **I.    LEGAL STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT.**

16      The legal standards for summary judgment are well known.  Summary judgment is

17  appropriate if the record, read in the light most favorable to the nonmoving party, demonstrates

18  no genuine issue of material fact and that the moving party is entitled to judgment as a matter of

19  law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c).  Material

20  facts are those necessary to the proof or defense of a claim, and are determined by reference to the

21  substantive law.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  The party with the

22  burden of persuasion at trial, the plaintiffs in this case, "must establish 'beyond controversy every

23  essential element of its . . . claim." *Southern California Gas Co. v. Santa Ana*, 336 F.3d 885, 887

24  (9th Cir. 2003).

25      At the summary judgment stage the question before the court is whether there are genuine

26  issues for trial, or whether the matter can be decided as a matter of law. *Southern California Gas*,

27  336 F.3d at 887.  Upon a showing that there is no genuine issue of material fact as to a particular

28  claim, the court may grant summary judgment in the party's favor, "upon all or any part thereof."

9

1   *Wang Laboratories, Inc. v. Mitsubishi Electronics, America, Inc.*, 860 F. Supp. 1448, 1450

2   (C.D. Cal. 1993); *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1441 (9th Cir. 1990).

3   **II.     THE SECOND AMENDMENT.**

4          As summarized above, plaintiffs claim that defendants' use of DROS fee revenues to fund

5   the APPS program violates the Second Amendment.  The Court should reject that contention.

6          The Second Amendment provides: "A well regulated Militia, being necessary to the

7   security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

8   U.S. Const. amend. II.

9          In the landmark case *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), the Supreme

10   Court held that the Second Amendment protects "an individual right to keep and bear arms," as

11   opposed to a collective one.  Critically, though, the Court further held that "[l]ike most rights, the

12   right secured by the Second Amendment is not unlimited.  From Blackstone through the 19th-

13   century cases, commentators and courts routinely explained that the right was not a right to keep

14   and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id*. at

15   626 (citations omitted).  Thus, while *Heller* did uphold the invalidation of a very strict law of the

16   District of Columbia that generally prohibited the possession of handguns, *id*. at 576, 636, *Heller*

17   took care to provide an expressly non-exhaustive list of "presumptively lawful regulatory

18   measures," *id*. at 627 n.26 — "a variety of tools" that "the Constitution leaves . . . for combating"

19   the problem of firearm violence in the United States.  *Id*. at 636.  That list includes prohibitions

20   on the possession of "weapons not typically possessed by law-abiding citizens for lawful

21   purposes, such as short-barreled shotguns," *id*. at 625, and "M 16 rifles and the like," *id*. at 627,

22   as well as "longstanding prohibitions on the possession of firearms by felons and the mentally ill,

23   or laws forbidding the carrying of firearms in sensitive places such as schools and government

24   buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id*. at

25   626-27.

26          Two years after *Heller*, the Supreme Court in *McDonald v. City of Chicago*, 561 U.S. 742,

27   130 S.Ct. 3020 (2010) held that the Second Amendment is fully incorporated against the States

28   via the Fourteenth Amendment.  130 S.Ct. at 3042.  Yet the Court explained that "incorporation

10

1   does not imperil every law regulating firearms." *Id*. at 3047.  In doing so, the Court was careful

2   to repeat that *Heller* "did not cast doubt on such longstanding regulatory measures as

3   'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the

4   carrying of firearms in sensitive places such as schools and government buildings, or laws

5   imposing conditions and qualifications on the commercial sale of arms.' [Citation.]"  *Id*. (italics

6   added).

7   **III.   DEFENDANTS USE OF DROS FEE REVENUES TO FUND THE APPS PROGRAM DOES
        NOT VIOLATE THE SECOND AMENDMENT.**

8

9            Neither *Heller* nor *McDonald* concerned the constitutionality of a firearm transaction fee.

10  In the First Amendment context, though, the Supreme Court held more than sixty years ago that

11  governmental entities may impose licensing fees relating to the exercise of constitutional rights

12  when the fees are designed "to meet the expense incident to the administration of the [licensing

13  statute] and to the maintenance of public order in the matter licensed."  *Cox v. New Hampshire*,

14  312 U.S. 569, 577 (1941) (quotation marks omitted).  In *Cox*, the Court upheld a provision in a

15  New Hampshire statute, for the licensing of parades and processions, establishing a range of fees

16  from a nominal amount to $300.  312 U.S. at 576.

17           In *Murdock v. Pennsylvania*, 319 U.S. 105 (1943), the Court invalidated a flat license fee

18  levied on distributors of religious literature.  Distinguishing the case from *Cox*, the Court stated:

19  "And the fee is not a nominal one, imposed as a regulatory measure and calculated to defray the

20  expense of protecting those on the streets and at home against the abuses of solicitors." 319 U.S.

21  at 116.  Elsewhere the Court characterized the fee as "not a nominal fee imposed as a regulatory

22  measure to defray the expenses of policing the activities in question."  *Id*. at 113-14.

23           The First Amendment case law in the Ninth Circuit also indicates that there is nothing

24  unconstitutional about imposing a fee on the exercise of a constitutional right when the fee is

25  designed to defray the broader administrative costs of regulating the protected activity.  In

26  *Southern Oregon Barter Fair v. Jackson County, Oregon*, 372 F.3d 1128, 1139 (9th Cir. 2004),

27  the court explained that "[a] state may . . . impose a permit fee that is reasonably related to

28  legitimate content-neutral considerations, such as the cost of administering the ordinance, the cost

11

1   of public services for an event of a particular size, or the cost of special facilities required for the

2   event."

3        Since *Heller* and *McDonald*, the courts that have considered the constitutionality of

4   charging fees in connection with the exercise of Second Amendment rights have used this First

5   Amendment framework.  Most recently, in *Kwong v. Bloomberg*, 723 F.3d 160, 161 (2d Cir.

6   2013) *cert. denied sub nom. Kwong v. de Blasio*, 134 S. Ct. 2696 (2014), the Second Circuit

7   upheld a $340 fee to obtain a residential handgun license in New York City.  Applying the

8   framework articulated by the Supreme Court in *Cox*, the Second Circuit found that "[t]he

9   undisputed evidence presented to the District Court demonstrates that the $340 licensing fee is

10  designed to defray (and does not exceed) the administrative costs associated with the licensing

11  scheme."  723 F.3d at 166.  The court therefore held that the District Court correctly concluded

12  that the city ordinance at issue imposed a constitutionally permissible "fee."  *Id*. at 167.

13       In *Justice v. Town of Cicero*, 827 F.Supp.2d 835, 837, 841 (N.D.Ill. 2011), the plaintiff

14  challenged a city ordinance's firearms registration requirement and its imposition of a $25.00

15  nonrefundable registration fee.  The court upheld the fee, finding that it was intended to defray

16  costs associated with registration and explaining that "there is no indication that the [city's] fee

17  was imposed for any other purpose."  827 F.Supp.2d at 842.  Like the fee in *Cox*, the firearms

18  registration fee in *Cicero* "'take[s] into account the greater public expense' and is 'not a revenue

19  tax, but one to meet the expense incident to the administration of the act and to the maintenance

20  of public order in the matter licensed.  There is nothing contrary to the Constitution in the charge

21  of a fee limited to the purpose stated.'"  *Id*. (quoting *Cox*, 312 U.S. at 577).

22       Finally, on remand in the *Heller* litigation, the district court upheld similar registration fees

23  enacted by the Council of the District of Columbia, the legislative branch of the local government

24  there.  Relying on a legislative committee report in the record, the court reasoned that the fee

25  provisions of the Act were constitutional because they were intended to compensate the District

26  for the costs associated with registration, including "fingerprinting registrants, . . . processing

27  applications and maintaining a database of firearms owners."  *Heller v. District of Columbia*, 698

28

1    F.Supp.2d 179, 192 (D.D.C. 2010), *rev'd in part on other grounds*, 670 F.3d 1244, 2011 WL

2    4551558 (D.C. Cir. Oct. 4, 2011).

3        Here, the record demonstrates that the $19.00 DROS fee is designed to defray DOJ's costs

4    associated with enforcing a variety of California's firearm laws, including but not limited to the

5    laws related to APPS.  The language of the statute itself states that the DROS fee is intended to

6    fund, among other things, "costs associated with funding Department of Justice firearms-related

7    regulatory and enforcement activities related to the sale, purchase, possession, loan, or transfer of

8    firearms pursuant to any provision listed in Section 16580."  § 28225(b)(11).  Fundamentally, the

9    APPS program concerns the investigation of individuals who are armed and prohibited from

10   possessing firearms and law enforcement's recovery of such firearms.  *See* §§ 30000-300015.

11   Thus, the APPS program surely falls within the purview of the broad language of section

12   28225(b)(11).

13       Additionally, the legislative history shows that in passing SB 819 the Legislature intended

14   DROS fee revenues to fund the APPS program.  For example, one Assembly committee report

15   explains regarding the bill: "The author's intent is to clarify that DOJ may use existing

16   department resources to help enforce the APPS to keep guns out of the hands of the more than

17   18,000 persons who are on California's Prohibited Armed Persons File due to mental illness,

18   felony convictions, or gun-related convictions."  *See* Assem. Com. on Appropriations, Analysis of

19   Senate Bill No. 819 (2011-2012 Reg. Sess.) July 16, 2011 at 2.  A Senate committee report

20   similarly states that SB 819 "would clarify that DOJ is permitted to use DROS funds to pay for its

21   efforts to retrieve unlawfully possessed firearms and prosecute individuals who possess those

22   firearms despite being prohibited by law from doing so."  Sen. Com. on Public Safety, Analysis

23   of Senate Bill No. 819 (2011-2012 Reg. Sess.) April 26, 2011 at 11.

24       The legislative history also shows that there is a direct relation between the DROS fee and

25   the APPS program.  As the author of SB 819 explained:

26       It is in everyone's interest to ensure that firearms are not in the possession of
         prohibited persons.  However, law-abiding firearms owners have a particularly
27       strong interest in this to help avoid gun ownership from becoming strongly
         associated with the random acts of deranged individuals.  Moreover, the purpose
28
                                                13

1
2
3
4
5

> of the bill is to strengthen enforcement of existing guns laws.  A prospective gun owner pays a fee to determine whether he or she is eligible to purchase a gun (background check), it makes sense that the fee should apply to enforcement when those same individuals become "ineligible" due to criminal behavior or mental illness.  Accordingly, there is a very close nexus between the DROS fund and the bill's intended purpose.  Moreover, the bill is aligned with gun advocates' stated interest in heightened enforcement of existing gun laws and the alternative would be to place this additional burden on the tax payer at large.

6  Assem. Com. on Appropriations, Analysis of Senate Bill No. 819 (2011-2012 Reg. Sess.) July 16,

7  2011 at 2; *see Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) ("When reviewing the

8  constitutionality of statutes, courts 'accord substantial deference to the [legislature's] predictive

9  judgments.'").  There is also a common sense connection between the payment of a fee which is

10  used, in part, to ensure that people desiring to possess firearms in California are not legally

11  prohibited from possessing them and the use of that fee to recover firearms from persons who

12  become prohibited from possessing them.

13  Finally, while the second amended complaint does not even allege the contrary, it is worth

14  noting that DOJ has in fact spent DROS fee revenues for the purposes intended by the

15  Legislature, including the APPS program.  During discovery, DOJ produced the documents

16  detailing those expenditures and explained those expenditures in its responses to written

17  discovery.  (*See, e.g.,* Hakl Decl., Exh. E (defendants response to Request for Admission Nos. 11

18  & 17); Exh. A (defendants' answer to Interrogatory No. 55); *see also* Exh. B (expenditure reports

19  at AG-00111 – AG-00145).)  Defendant Lindley also testified to DOJ's use of DROS funds on

20  the APPS program.  (*See, e.g.,* Lindley Depo. at 57:16-62:18.)

21  Accordingly, like the fees upheld in *Kwong*, *Cicero* and *Heller*, the $19.00 DROS fee

22  "take[s] into account the greater public expense" and is "not a revenue tax, but one to meet the

23  expense incident to the administration of the act and to the maintenance of public order in the

24  matter licensed.  There is nothing contrary to the Constitution in the charge of a fee limited to the

25  purpose stated."  *Cox*, 312 U.S. at 577 (internal quotations and citation omitted).  Accordingly,

26  the $19.00 DROS fee does not run afoul of the Second Amendment.

27
28

14

1

**CONCLUSION**

2      For the reasons set forth above, defendants respectfully requests that the Court grant their

3    motion for summary judgment in its entirety.

4    Dated:  January 20, 2015                    Respectfully Submitted,

5                                                KAMALA D. HARRIS
                                                 Attorney General of California
6                                                STEPAN A. HAYTAYAN
                                                 Supervising Deputy Attorney General
7

8

9                                                */s/ Anthony R. Hakl*
                                                 ANTHONY R. HAKL
10                                               Deputy Attorney General
                                                 *Attorneys for Defendants*
11
     SA2011102315
12   Memo of P&As in Sup MSJ.doc

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment
(1:11-cv-01440-LJO-MJS)